CASTEL PROPERTIES, LIMITED, *et al.*, Plaintiffs and Counterdefendants-Appellees and Cross-Appellants, v. THE CITY OF MARION, Defendant and Counterplaintiff-Appellant and Cross-Appellee.

Fifth District   No. 5—91—0196

Opinion filed March 30, 1994.

Michael M. Conway and John F. Zabriskie, both of Hopkins & Sutter, of Chicago, and Garrison & Garrison, of Marion (James T. Garrison, of counsel), for appellant.

Don H. Reuben, Terry M. Grimm, James R. Vogler, and Mark L. Shaw, all of Winston & Strawn, of Chicago, and Feirich/Schoen/Mager/Green, of Carbondale (Paul G. Schoen and Michael F. Dahlen, of counsel), for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant-counterplaintiff, City of Marion (hereinafter city), appeals from an action brought by plaintiffs-counterdefendants, Castel Properties, Limited, J.D. Castellano, Ron Emery, and Castel Loan Corporation (hereinafter plaintiffs), seeking declaratory and injunctive relief with respect to two tax-increment-financing (TIF) redevelopment plans adopted by the city. The Tax Increment Allocation Redevelopment Act (Act) (Ill. Rev. Stat. 1989, ch. 24, par. 11—74.4—1 et seq. (now 65 ILCS 5/11—74.4—1 et seq. (West 1992))) is a unique statute providing options for municipalities that wish to eliminate blight within their boundaries. It permits a municipality to

divert tax revenues from other governmental entities in the city and use that money to subsidize improvements to areas that meet the statutory specifications of a TIF district. In the case below, plaintiffs challenged the first TIF plan (TIF 1) on the theory that the area designated did not comply with the statutory requirements of the Act. The circuit court of Williamson County found that TIF 1 did comply with the statutory requirements, and the court entered judgment in favor of the city. Plaintiffs challenged the second TIF plan (the Illinois Centre TIF) on several grounds. The trial court found in favor of plaintiffs on that issue and entered judgment accordingly.

In this appeal, the city contends that the trial court's judgment pertaining to the Illinois Centre TIF was in error, and that the Illinois Centre TIF did, in fact, comply with the statutory requirements of the Act.

Plaintiffs cross-appeal the trial court's judgment on TIF 1, contending that TIF 1 is invalid as a matter of law because it contains no provision to reduce or eliminate the qualifying blight. We affirm.

The city's appeal involves an area known as the Illinois Centre TIF, which was created in 1989 to generate an $18 million subsidy to developers of a shopping mall. The Illinois Centre TIF comprises 260 acres of farmland, running north along Route 13, less than one-half mile from the Route 13 interchange with Interstate 57. Before the Illinois Centre TIF was created, the property, also known as Broeking Farm, was located entirely outside of the Marion city limits. It had been an active farm since 1840. In 1985, the city circulated a report describing the development potential of Broeking Farm as follows:

> "The land is suitable for a commercial property and will be annexed into the City of Marion in order to provide sewer, water, and electrical and gas service for the proposed development. The property will then be zoned in accordance with development plan. *** Marion is literally the hub of the interstate system. Practically all the property east of the [Interstate] 57 interchange has been developed. Development is now underway adjacent to the property. The property will be annexed into Marion to obtain advantages of zoning, city streets and utilities, fire protection, etc. The property will be developed for commercial, light industrial, single-family lots, multifamily lots, mobile home sites and apartment sites. It will become the real 'City of Southern Illinois.' "

There is no dispute concerning the land development trend in Marion. In the 1940's and 1950's, Marion's shopping district was centered on the town square. Since then, Marion's development has

moved westward. The construction of Route 13 and Interstate 57 prompted the development of three shopping centers, all west of Marion's town square. Beginning in the mid-1960's, the city annexed large tracts of land along Route 13, and utilities were extended to Route 148. Most commercial development from 1965 to 1989 was concentrated in the areas along Route 13 and the interchange of Route 13 and Interstate 57, within a half mile of the Broeking Farm. Those commercial developments included retail shopping centers, restaurants, financial institutions, hotel/motels, office buildings, and automobile dealerships.

At trial, plaintiffs presented evidence to show that in the mid-1980's, development was occurring and would continue to occur in the proximity of the Broeking Farm. Plaintiffs also stated that there had been a significant increase in the assessed valuation of the property in the vicinity of Broeking Farm. In support of these assertions, plaintiffs presented three experts who testified that the Illinois Centre tract did not qualify for TIF subsidies. Tom Forman, an architect/planner, testified that Marion's development would continue westward and that the Illinois Centre tract had inherent value because of its size and location. Urban planner John Brancaglione stated that based on historical trends of past development, he believed that there could be "any number of scenarios" under which the property would develop without TIF subsidies. William Newman, a real estate appraiser, concluded that the Illinois Centre tract would ultimately develop without TIF subsidy due to site visibility, location, and access to utilities.

In contrast, the city presented evidence to show why the Illinois Centre tract required a TIF subsidy to develop according to the city's comprehensive plan. The city argued that prior development in the area did not conform to the city's comprehensive plan and that all such development was "strip development," i.e., 200- to 400-foot-deep development, rather than large-scale, planned development. The city also presented evidence that it made previous efforts to develop the property in the area of the Broeking Farm in a manner consistent with its comprehensive plan. One example the city presented as a failed effort was "Marion West," a development program encompassing industrial, commercial, and residential development similar to the city's plan for the Illinois Centre tract. The city claimed that a lack of subsidy was the biggest reason the project never came to fruition. Further supporting their position that the Illinois Centre tract required TIF status, the city presented evidence of another failed development in the area. The Saluki National Golf Course was envisioned as an 18-hole golf course with single-family homes

adjoining the course. The project, directly south of the Broeking Farm across Route 13, collapsed after a few homes were built.

The events that prompted this lawsuit began in 1986, when Antonia Investments of St. Louis (Antonia) began to study the Broeking Farm as a possible site for a regional shopping mall. Gary Kobes, a representative of Antonia involved in site selection, testified that Antonia was interested in developing a mall close to the interstate. After evaluating five possible sites, Antonia's first choice was the Broeking Farm, in part because the property was the largest parcel under single ownership. On February 9, 1987, Antonia and the Broekings entered into an option/purchase agreement, under which Antonia would buy the parcel for $1.25 million if certain contingencies were met. The deal was contingent upon Antonia's ability to arrange for tax-increment financing or some other acceptable financial subsidy to fund the shopping center development. The parties also agreed to have the city annex the property.

After acquiring the option to purchase the Broeking Farm, Antonia met with the mayor of Marion and Robert Vancil, an economic development consultant and specialist in TIF districts, retained by the city, to discuss the funding of Antonia's project. On March 13, 1987, Vancil's company, Community Economic Development Corporation (CEDC), entered into an agreement with the city in which the city would pay CEDC $25,000 plus 5% of the anticipated tax increment for securing a developer (already designated as Antonia) and creating a TIF district. The contract provided that CEDC was to get 5% of "those sums derived for and on behalf of the city and the developer through any annexation agreement," which the city's mayor and Vancil acknowledged to the trial court was the equivalent of 5% of project costs, or the tax increment. Thus, the city would pay Vancil up to $750,000 of tax revenues for conceiving a TIF plan to provide financial aid to Antonia's shopping mall development. Both the city's mayor and Vancil admitted to the trial court that such an arrangement was illegal under the Act. See Ill. Rev. Stat. 1989, ch. 24, par. 11—74.4—3(q)(1) (now see 65 ILCS 5/11—74.4—3(q)(1) (West 1992)).

Pursuant to his contract with the city, Vancil conducted a field survey of Broeking Farm and the surrounding area. Vancil's field notes do not indicate he found any qualifying blight on the Broeking Farm that he thought should be addressed and eliminated. In early June 1987, Vancil finished preparing a draft plan of a TIF including Broeking Farm, but the parcel had not yet been annexed by the city. On June 10, 1987, the city passed a resolution declaring its intent to create a TIF district in an area Vancil designated (hereinafter

referred to as the Vancil TIF). On July 13, 1987, a public hearing on the Vancil TIF was held, and the city, the Broekings, and Antonia entered into an agreement annexing the Broeking Farm into the city that same day. The annexation was, however, contingent upon the city constructing more than $3 million worth of infrastructure on the farm for Antonia's benefit and a $15 million grant from the city to Antonia for the mall development. The annexation agreement further provided that Antonia could disconnect the Broeking Farm from the city should the city fail to perform its $18 million obligation.

The Vancil TIF was formally designated a TIF district on July 28, 1987. That TIF was comprised of what is now referred to as TIF 1 and the Illinois Centre TIF. On July 27, 1987, the day before the designation of the Vancil TIF, the city prepared and accepted a document captioned "Broeking Acres," which attempted to subdivide the farm into three tracts. According to the Act, land that has been actively farmed within the last five years does not qualify for inclusion in any TIF unless it has been subdivided (see Ill. Rev. Stat. 1989, ch. 24, par. 11—74.4—3(v)), a requirement of which the city was surely aware. The plat was a site plan of the farm with two vertical lines drawn through the parcel, dividing the property into three tracts. The facts surrounding the creation of the Broeking Acres plat are undisputed. On July 1, 1987, city engineer Glenn Clarida sent a draft of the proposed Broeking subdivision to Vancil's attorney. In the attached letter, Clarida stated: "Due to the time frame I believe we had better handle any discussion by telephone." After counsel's consultation on the plat, the city council accepted the Broeking Acres subdivision the day before the Vancil TIF was adopted.

Plaintiffs filed suit in January 1989, challenging the validity of the Vancil TIF. The complaint alleged:

"(1) that the city was attempting to subsidize development of the shopping mall on the unblighted Broeking Farm by including the farm in a large TIF district that contained blighted property; and

(2) that none of the TIF revenues were earmarked for eliminating any blight, but rather all the funds were being used illegally to subsidize Antonia's private shopping mall development."

Immediately after the suit was filed, Antonia negotiated and executed with the city a series of addenda agreements and ordinances to ensure alternative city financing if plaintiffs' action succeeded in invalidating the Vancil TIF. The first of these agreements was an amendment to the Broeking annexation agreement, entered into on March 20, 1989. In that agreement, the city promised to provide backup financing for the mall development should the TIF be legally

disqualified, so that Antonia was guaranteed the $18 million subsidy. The city also agreed, upon Antonia's request, to disconnect the Broeking Farm from the TIF and create a new TIF with the farm plus any other property Antonia designated. On August 28, 1989, the city passed a zoning ordinance creating a planned unit development for the proposed Illinois Centre TIF, providing building specifications and permitted uses of the property. On September 27, 1989, the city altered its TIF plan again by a "Second Amendment to [the Broeking] Annexation Agreement." In the second amendment, the city agreed to reconfigure the Vancil TIF into two TIF districts: (1) TIF 1, comprised of the Vancil TIF minus the Broeking Farm, and (2) the Illinois Centre TIF, comprised of the Broeking Farm alone. The city also agreed in the second amendment to provide the $18 million subsidy from "alternate financing options" if the Illinois Centre TIF was declared invalid, as well as $6 million in special service area financial assistance.

At this time, the city retained another urban planning expert, Richard Ward, to determine whether blight existed on Broeking Farm. Ward concluded that the farm contained three blighting conditions: (1) diversity of ownership, (2) flooding, and (3) deterioration of structure or site improvement in neighboring areas. After receiving Ward's conclusions, the city notified all taxing districts affected by the proposed Illinois Centre TIF and convened a joint review board with representatives of those districts to comment on the proposed TIF. The joint review board unanimously approved the Illinois Centre TIF. The city held a public hearing on the issue on November 16, 1989, and the city council unanimously voted to establish the Illinois Centre TIF.

On November 30, 1989, the city formally designated the Illinois Centre TIF and TIF 1. TIF 1 contains more than 1,400 acres, divided into more than 400 parcels of property. All parties agree that TIF 1 contains substantial conditions of blight. The TIF 1 plan contains four projects—a plumbing company distribution facility, a motel/restaurant/convenience store development, an industrial area, and a commercial and recreational development. However, many of the blighted areas included in TIF 1 are not scheduled in the plan for redevelopment or demolition.

After hearing all the evidence, the circuit court ruled in favor of the city on TIF 1 and found that the Illinois Centre TIF did not comply with the Act in the following respects: (1) the property in the TIF would likely develop without TIF incentives; (2) the property in the TIF was not blighted within the meaning of the Act; and (3) the property in the TIF was not eligible for TIF treatment because it was commercial farmland that had not been properly subdivided.

■ The city urges this court that the trial court, and this court, must defer to the findings of the city council made in ordinance No. 1302 whereby the Illinois Centre TIF was established unless there is no reasonable basis for the council's findings. In essence, it contends that the legislative findings are entitled to a deference which the trial court did not give them and that the findings may only be overturned if they are unreasonable, arbitrary, and have no basis in fact, in effect an abuse of discretion. An examination of the record and the order of the trial court, however, indicates the trial court did give appropriate deference to the city's legislative findings.

The trial court itself also articulated its deference to the city's legislative findings. In its memorandum of decision, incorporated by reference into the order of the court, the trial court stated as follows:

"No issue in this case involves whether the proposed mall or any other redevelopment project is wise or unwise, popular or unpopular, desirable or undesirable. The underlying issue in this case is whether or not the Defendant city has followed the statutes and applicable laws with respect to the issues before the court.

The court must give and has given due deference to the ordinances of the Defendant city along with the findings made in those ordinances. Such findings, if overcome, must be overcome by clear, strong, substantial evidence tantamount to the 'clear and convincing' standard of evidence recognized in our civil courts. This does not mean that the court must suspend its rational faculties or fail to use its common sense when viewing the evidence as to whether or not the action of the Defendant's corporate authorities were predicated on a sound legal and factual basis."

Our examination of the remaining part of this memorandum of decision, as well as the order and record, indicates that the trial court consistently adhered to its articulated standard of deference in its consideration of both TIF 1 and the Illinois Centre TIF. *Village of Wheeling v. Exchange National Bank* (1991), 213 Ill. App. 3d 325, 572 N.E.2d 966.

■ In addressing the other issue common to consideration of both TIF plans, the court, as noted above, articulated the standard of proof that plaintiffs needed to overcome as clear and convincing. Specifically, the court stated in its memorandum of decision:

"Such findings [referring to those in the ordinances], if overcome, must be overcome by clear, strong, substantial evidence tantamount to the 'clear and convincing' standard of evidence recognized in our civil courts."

Our review of the memorandum of decision, the order, and the record in this case indicates that the trial court repeatedly referred to clear and convincing as the standard of proof and utilized this stan-

dard in its consideration of the parties' assertions. We also conclude that this was the correct standard of proof to be applied in a situation such as this, especially when considering legislative findings and the reasonableness and factual basis for those findings. *Village of Wheeling v. Exchange National Bank* (1991), 213 Ill. App. 3d 325, 572 N.E.2d 966.

## ILLINOIS CENTRE TIF

The major conflict of the parties concerns the Illinois Centre TIF. The city first contends that the blight factors noted in the statute and found by the city in ordinance No. 1302 were present and affected the Illinois Centre tract. Specifically, the city claims that these blight factors impeded the type of development the city desired in that property and that the TIF was necessary to develop this property in accord with the city's comprehensive plan. Plaintiffs, on the other hand, contend that the evidence supports the trial court's findings that the Illinois Centre TIF was not a blighted area as defined by the statute and it therefore failed the "but for" test. We agree with plaintiffs.

■ The relevant part of the statute concerning its definition of blighting factors and what the city must find is as follows:

"(a) 'Blighted area' means any improved or vacant area within the boundaries of a redevelopment project area located within the territorial limits of the municipality where, *** if vacant, the sound growth of the taxing districts is impaired by, (1) a combination of 2 or more of the following factors: obsolete platting of the vacant land; diversity of ownership of such land; tax and special assessment delinquencies on such land; flooding on all or part of such vacant land; [or] deterioration of structures or site improvements in neighboring areas adjacent to the vacant land ***.

* * *

(n) *** No redevelopment plan shall be adopted by a municipality without findings that (1) the redevelopment project area on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan ***.

* * *

(v) As used in subsection (a) of Section 11—74.4—3 of this Act, 'vacant land' means any parcel or combination of parcels of real property without industrial, commercial and residential buildings which has not been used for commercial agricultural purposes within 5 years prior to the designation of the redevelopment proj-

ect area, unless such parcel is included in an industrial park conservation area or such parcel has been subdivided." (Ill. Rev. Stat. 1989, ch. 24, pars. 11—74.4—3(a), (n), (v) (now see 65 ILCS 5/11—74.4—3(a), (n), (v) (West 1992)).)

The city, in its ordinance, found the following factors concerning blight:

"*Section 1.* That the City Council finds and determines as follows:

\*\*\*

(b) There exist conditions which cause the area proposed to be designated as a Redevelopment Project Area to be classified as a 'blighted area' as defined in Section 11—74.4—3(a) of the Act.

(c) The proposed Redevelopment Project Area on the whole has not been subject to growth and development through investment by private enterprise and would not be reasonably anticipated to be developed without the adoption of the proposed Redevelopment Plan."

The trial court first considered the question of diversity of ownership. The court noted that 90% of the proposed TIF area is comprised of the Broeking Farm and that various rights of way and easements, including rights of the State, did not present a problem as far as "diversity of ownership" sufficient to constitute a factor of blighting. In essence, the trial court concluded that there was no evidence of diversity of ownership being an impeding factor as far as development is concerned. We agree that this finding is solidly based on the evidence in this record and does not constitute an abuse of discretion.

The second element of blighting that the court addressed was flooding. The trial court specifically found that there was a lack of evidence of any significant flooding. Specifically, the Department of Transportation, in an environmental assessment, stated that the project site was not located in a flood plain, aerial views of the property showed no topographical flood plain characteristics, and there was no evidence in the record that flooding had at any time interfered with the ongoing farming operation on the property. The circuit court did note a statement by Mr. Broeking that on one occasion a small number of acres of his property had flooded, but the flood water quickly subsided. The circuit court concluded, and we agree, that this is insufficient evidence of flooding so as to constitute a blight factor.

The third blighting factor, the presence of deteriorating structures in the neighborhood, was also found insufficient by the circuit court. Those factors were an abandoned motorcycle shop on the south side of Route 13, a cold-storage processing facility to the west of the Broeking Farm, and a wrecking business, also to the west. The circuit

court found that these structures are hardly visible from the center of the area and had not been shown to impede development. This finding also meets the clear and convincing standard and does not constitute an abuse of discretion.

The circuit court also found, and the city contests, that the development of this area was likely to occur without TIF treatment. The city essentially argues that the circuit court erred by ignoring two factors in reaching this conclusion. First, the court failed to note evidence of past failures of development, specifically, two commercial projects. Secondly, the city argues the court fails to consider whether this area would have developed in a manner considered appropriate by the city and in conformity with its comprehensive plan. Plaintiffs argue the evidence showed that the history of development in this area indicated the Illinois Centre TIF area would develop commercially, since it was in an area west of Interstate 57 and along Illinois Route 13, a corridor of development in the past and likely to be so in the future. Plaintiffs, in effect, say that this area would develop anyway and therefore fails the "but for" test. The circuit court agreed with plaintiffs and so do we.

■ According to the city's argument, implicit in the legislative finding that the project area would not develop is the requirement that it develop in a manner contemplated by the city's comprehensive plan. What the statute requires is a finding that the area is not subject to growth or development and it is not reasonably anticipated that the area will be developed. (Ill. Rev. Stat. 1989, ch. 24, par. 11—74.4—3(n).) This requirement does not mention, and does not contemplate, the anticipated growth necessarily being in conformity with the city's comprehensive plan for development. The General Assembly has indicated by the Act that any commercial growth or development is the standard. The requirement that development be in conformity with a comprehensive plan applies to the redevelopment plan to be adopted by the city, not to the legislative finding that no growth or development would occur. Given the extensive evidence in this record that growth and development were occurring in this area and that the area was a corridor for growth and development and, specifically as to this project, that the Illinois Centre was being erected without the TIF issue having been finally determined, we cannot say that the trial court was without a sufficient basis in this record to conclude that the city failed to meet the "but for" test as articulated in the statute. Concerning the two prior projects that failed, the circuit court noted, and our review of the record also concludes, that there was no specific evidence given as to the reason for their failures. While naturally all of the relevant evidence

concerning a particular point must be considered by the circuit court in reaching its conclusion, we cannot say that the existence of these two business failures was a sufficient basis so that the trial court must, of necessity, hold that plaintiffs failed to meet their standard of clear and convincing evidence to overcome the city's legislative findings.

■ The circuit court found another infirmity with the Illinois Centre TIF findings. The statute specifically requires that if the proposed land has been used for commercial agricultural purposes within five years prior to the TIF designation, the parcel must have been subdivided in order to qualify for TIF status. Plaintiffs urge, and the court so found, that the Broeking Farm property was platted and subdivided just one day before the original TIF, now TIF 1, was created, and that its subdivision was ineffective. The city claims that the subdivision, regardless of timing, was sufficient under the Act. Both cite *City of Urbana v. County of Champaign* (1979), 76 Ill. 2d 63, 389 N.E.2d 1185, to support their position. Since the circuit court found by clear and convincing evidence that the blight-factor requirement of the Act was not met and the area would develop without the TIF, both of which are crucial questions under the Act, we need not address this issue in order to resolve this appeal.

## TIF 1

■ Plaintiffs cross-appeal concerning TIF 1, claiming that the TIF 1 plan is invalid as it contains no program to eliminate the blight factors upon which the TIF finding is based. The statute reads as follows:

> "(n) 'Redevelopment plan' means the comprehensive program of the municipality for development or redevelopment intended by the payment of redevelopment project costs to *reduce or eliminate* those conditions the existence of which qualified the redevelopment project area as a 'blighted area' \*\*\*." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 24, par. 11—74.4—3(n) (now see 65 ILCS 5/11—74.4—3(n) (West 1992)).)

The trial court found that the area was clearly blighted and that the redevelopment plans were in conformity with the city's comprehensive plan. There is no serious dispute about either of these propositions. The trial court then proceeded to find that the resulting TIF treatment of the area in TIF 1 would result in growth and development intended by the Act which would reduce or eliminate the blight factors:

> "The redevelopment plans for TIF 1 are consistent with and in conformity with the Defendant city's Comprehensive Plan. The redevelopment plans would reduce or eliminate blight factors and

resulting blight, as well as promot[e] the safety, health, morals, and welfare of the people. Further development, economic and physical, is impaired by the existence of blight in TIF 1. The redevelopment project area *as a whole* has not been subject to growth. Further development without the adoption of a redevelopment plan would not be anticipated. TIF treatment is likely to generate new buildings by private enterprise. This is all as is intended by statutory design. Also, the qualification of the whole area as blighted makes possible future developments not now anticipated, carrying on the intention of the statute. Whatever residual doubt may exist with reference to the 'But For' test or on the redevelopment plans' elimination of specific blight factors, the court defers to the findings of the corporate authorities of the Defendant city. The Plaintiffs failed their burden of clear and convincing evidence on these issues, and where evidence is in equipoise or even if slightly in favor of the Plaintiffs, the court must, by law, defer to the action and findings of the Defendant city." (Emphasis in original.)

We agree with the trial court's interpretation of the Act. The statute does not require specific plans for elimination of each designated blight factor. Its intent is to provide stimulus and nurturing of economic development with the beneficial result of reduction, possibly elimination, of the blight factors. Plaintiffs' claimed requirement that elimination of each blight factor must be specifically addressed by the city is not present in the Act. We conclude, rather, that adoption of a TIF treatment that reduces or eliminates the blight factors the city has found is in substantial compliance with the Act.

We conclude that the circuit court properly enjoined the city concerning the Illinois Centre TIF and properly denied injunctive relief concerning TIF 1.

For the foregoing reasons, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

WELCH[1] and CHAPMAN, JJ., concur.

---

[1]Justice Lewis was originally assigned to this case; Justice Welch was later substituted on the panel.