THE CITY OF CHICAGO, Plaintiff-Appellee, v. BOULEVARD BANK NATIONAL ASSOCIATION, as Trustee Under Trust Agreement Dated November 11, 1986, and Known as Trust Number 8348, *et al.*, Defendants-Appellants.

First District (6th Division)    No. 1—96—2799

Opinion filed December 12, 1997.

Winston & Strawn, of Chicago (Mattias A. Lydon, Thomas V. Skinner, Carolyn F. McNiven, and Raymond Perkins, of counsel), for appellants.

Susan Sher and Earl Neal & Associates, both of Chicago (Earl L. Neal, Richard F. Friedman, and D. Rainell Rains, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

This case is brought on appeal from an August 5, 1996, order entered by the circuit court of Cook County denying defendants' traverse and motion to dismiss the City of Chicago's (City's) complaint for condemnation, with respect to the quick take of the Oliver Typewriter Building (the Oliver Building) located at 159 North Dearborn Street.

On appeal, defendants contend that: (1) the trial court erred in holding that the City could acquire the Oliver Building with tax increment financing (TIF) for the stated purpose of assembling the property with the Oriental Theater where the City failed to amend the existing TIF plan pursuant to the Illinois Tax Increment Allocation Redevelopment Act (TIF Act) (65 ILCS 5/11—74.4—1 *et seq.* (West 1994)); (2) due to the failure to amend the existing TIF plan, the Oriental Theater Project could not proceed and therefore the requisite necessity for taking the Oliver Building was lacking; (3) the City failed to provide the requisite certainty as to whether or not the Oliver Building was at risk of condemnation; and (4) the quick-take provisions of section 7—103 of the Illinois Code of Civil Procedure (735 ILCS 5/7—103 (West 1994)) are unconstitutional special legislation. For the following reasons we affirm.

Defendants Golden P Corporation and Peter Palivos, respectively, are the manager and owner of the Oliver Building, and were among the defendants named in the City's complaint. Palivos had purchased the Oliver Building for $2 million in late 1986 and allegedly invested $750,000 in it. The rear of the Oliver Building abuts the Oriental Theater Building, which faces Randolph Street. The Oriental Theater has not operated as a commercial theater since 1981. In 1994, Livent, Inc. (Livent), a live entertainment and development company headquartered in Toronto, secured an option to purchase the Oriental Theater. Livent then notified the City that it had secured the option on the Oriental Theater. The City's consultant for North Loop

development, U.S. Equities Development Company, commissioned a report which in January of 1995 determined that the stage area of the Oriental Theater was too shallow to accommodate modern live musical productions and that this failing would need to be remedied by expanding the stage area back into the Oliver Building before renovation of the Oriental Theater could proceed. A Chicago real estate developer retained by Livent in March of 1995 valued the building at less than $3 million. On April 14, 1995, Palivos told Livent he would sell the Oliver Building and the adjacent Delaware Building for $10 million. No further negotiations were had between Palivos and Livent.

On December 1, 1995, the City signed a letter of understanding with Livent agreeing to acquire the Oliver Building on behalf of Livent to assist in the redevelopment of the Oriental Theater. By letter dated January 11, 1996, the City informed Palivos that it intended to acquire the Oliver Building.

A public hearing on the Oriental Theater Project was held by the Community Development Commission (CDC) on January 29, 1996. At this hearing, the CDC adopted two resolutions: the first authorized publication of a notice of the City's intent to negotiate a redevelopment agreement with Livent and to request alternative proposals, and recommended to the Chicago city council that Livent be designated as the developer if no other responsive alternative proposals were received; the second authorized the City to advertise its intent to enter into a negotiated sale of the Oliver Building to Livent. On January 31, 1996, these public notices were run in the Chicago Sun-Times. The notices provided 30 days for members of the public and other developers to make alternative proposals and bids. No alternative proposals were submitted. On March 22, 1996, Palivos appeared at the Chicago city council committee on finance and expressed his opposition to the acquisition of the Oliver Building.

On March 26, 1996, the Chicago city council passed two "Substitute Ordinances." The first ordinance declared that the redevelopment of the Oriental Theater property and the Oliver Building Property would be "in accordance with" the North Loop Tax Increment Financing Project ordinances passed in June 1984 (1984 TIF Plan). It further provided that Livent was to be the developer of the Oriental Theater Project and that the City would finance the acquisition of the Oliver Building with tax increment financing and then convey the Oliver Building to a Livent subsidiary for assemblage with the Oriental Theater. The second ordinance found it necessary to acquire the Oliver Building and authorized its acquisition pursuant to the City's home rule power in a quick-take proceeding.

On April 9, 1996, the City of Chicago filed an eminent domain action to acquire the Oliver Building. The City subsequently filed a motion for vesting of title and requested that the trial court assign the matter for a "quick take" hearing pursuant to section 7—103 of the Illinois Code of Civil Procedure. 735 ILCS 5/7—103 (West 1994). On May 15, 1996, defendants filed an amended traverse and motion to dismiss, challenging the City's authority to condemn the Oliver Building and invocation of quick-take procedures because the ordinances authorizing the condemnation of the Oliver Building changed the nature of the redevelopment project and the condemnation affected the general land uses established in the North Loop 1984 TIF Plan. Defendants further alleged that the renovation of the Oriental Theater also changed the nature of the redevelopment project and affected the general land uses established in the North Loop 1984 TIF Plan. The defendants asserted that these changes required the City to go through the approval process required by section 11—74.4—5(c) of the TIF Act (65 ILCS 5/11—74.4—5(c) (West 1994)). The defendants also claimed that the City failed to provide the requisite certainty that the Oliver Building was at risk of condemnation. The defendants further claimed that the quick-take statute is unconstitutional special legislation.

The record indicates that, at the hearing before the trial court on the factual issues, the City submitted the ordinances, resolutions and offers setting forth the purpose and necessity of the acquisition of the subject property and establishing the blighted character of the subject area. In rebuttal, defendants presented testimony of certain City officials called as adverse witnesses, as well as the testimony of representatives of Livent. On August 5, 1996, the trial court entered an order denying defendants' traverse and motion to dismiss. The trial court found that the Oliver Building was located in a blighted commercial area and that the Chicago city council had passed ordinances authorizing the condemnation proceedings. The trial court found that the condemnation of the Oliver Building did not change the general land use or the nature of the redevelopment project and therefore the City was not required to comply with the notice requirements of the TIF Act before acquiring the Oliver Building. 65 ILCS 5/11—74.4—5(a), (c) (West 1994).

As to defendants' assertion that the agreement between the City and Livent regarding the renovation of the Oriental Theater violated the TIF Act, and therefore the taking of the Oliver Building was not necessary, the court ruled that the agreement was not before it. The defendants assert that the trial court ruled that the renovation agreement violated the notice provisions of the TIF Act. However, the rec-

ord reveals that the trial court stated it would not consider whether the agreement between the City and Livent as to the renovation of the Oriental Theater required the City to follow the notice requirements of section 11—74.4—5(c) of the TIF Act. The trial court further ruled that the City provided the defendants with the requisite certainty that the Oliver Building was at risk for condemnation. The trial court also rejected defendants' argument that the quick-take statute is unconstitutional special legislation. The trial court subsequently denied defendants' motion for reconsideration, at which time defendants filed an interlocutory appeal of both aforementioned rulings as a matter of right pursuant to Supreme Court Rule 307 (134 Ill. 2d R. 307) and section 7—104 (735 ILCS 5/7—104 (West 1994)).

We first examine defendants' assertion that, since the 1984 TIF Plan designated the Oliver Building as "rehabilitation without acquisition," the City was required to amend the TIF plan before acquiring it for the purpose of assembling it with the Oriental Theater. Defendants further claim that, since the 1984 TIF Plan did not mention the Oriental Theater, the City was required to amend the TIF plan before making TIF funds available to Livent to purchase and rehabilitate it. Defendants argue that the City's failure to amend the TIF plan to provide for the Oriental Theater Project makes the stated subsequent use of the Oliver Building unlawful and therefore its taking unnecessary as a matter of law. Specifically, defendants assert that the City changed the nature of the redevelopment project without going through the approval process required by section 11—74.4—5(c) of the TIF Act (65 ILCS 5/11—74.4—5(c) (West 1994)). Section 11—74.4—5(c) of the TIF Act provides:

"After the adoption of an ordinance approving a redevelopment plan or project or designating a redevelopment project area, no ordinance shall be adopted altering the exterior boundaries, affecting the general land uses established pursuant to the plan or changing the nature of the redevelopment project without complying with the procedures provided in this division pertaining to the initial approval of a redevelopment plan project and designation of a redevelopment project area." 65 ILCS 5/11—74.4—5(c) (West 1994).

The procedures pertaining to the initial approval of a redevelopment plan project include a requirement of a public hearing to allow "interested person(s) or affected taxing district(s)" to file written objections to the plan with the municipal clerk and to be heard orally as to issues embodied in the plan.

Upon a municipality's determination that an area qualifies as a

redevelopment project area as defined in section 11—74.4—3(p) of the TIF Act, it may then develop a redevelopment plan. Section 11—74.4—3(n) of the Act provides, in pertinent part:

> " 'Redevelopment plan' means the comprehensive program of the municipality for development or redevelopment intended by the payment of redevelopment project costs to reduce or eliminate those conditions the existence of which qualified the redevelopment project area as a 'blighted area,' or 'conservation area' or combination thereof or 'industrial park conservation area' and thereby to enhance the tax bases of the taxing districts which extend into the redevelopment project area." 65 ILCS 5/11—74.4—3(n) (West 1992).

Section 11—74.4—3(n) of the Act requires that the redevelopment plan be in writing and meet certain other criteria not germane to this appeal.

Following creation of the redevelopment project area and approval of a redevelopment plan and project, the municipality is granted the power, among other things, to:

> "(c) Within a redevelopment project area, acquire by *** eminent domain; own, convey, *** or dispose of land and other property, real or personal, *** all in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project. ***
>
> (d) Within a redevelopment project area, clear any area by demolition or removal of any existing buildings and structures.
>
> (e) Within a redevelopment project area, renovate or rehabilitate or construct any structure or building." 65 ILCS 5/11—74.4—4(c), (d), (e) (West 1994).

A review of the City's efforts to develop the North Loop Area shows that in March of 1979, the Chicago city council enacted an ordinance declaring the North Loop Development Area a blighted commercial area. The City's goals for the North Loop were set out in the Redevelopment Plan for Blighted Commercial Area North Loop, approved by the City Council on March 28, 1979 (1979 Redevelopment Plan). As originally enacted, the redevelopment plan contained an acquisition map which designated the Oliver Building as "not to be acquired." The Redevelopment Plan noted, however, that such acquisition status would change where

> "the exclusion of the property has a detrimental effect on the disposition and redevelopment of the abutting project property or *** if the existing owner or owners are unwilling or unable *** to conform to the objectives of the Plan."

The Chicago city council amended the 1979 Redevelopment Plan on October 27, 1982, when it passed the North Loop Guidelines For

Conservation and Redevelopment (1982 Redevelopment Guidelines). The 1982 Redevelopment Guidelines deleted all reference to the "not to be acquired" language.

The new plan contained a map of the entire redevelopment area, including the block that the Oliver Building is located on, block 36. This map designated block 36 as containing "Theater Row Development" and "Satellite Cultural Facilities."

Under the heading "Theater Row Development," the plan provided:

> "This North Loop area once contained more than a dozen theaters and movie houses and many restaurants and lounges whose existence was directly related to successful theater operations. Through the years both theater programming and consumer habits have changed, and the number of entertainment facilities has been reduced while the quality of programming has generally declined. However, the redevelopment of the North Loop, with the impending construction of hotel rooms, residential units and major new office spaces can and will include the appropriate reuse of certain existing facilities—The Chicago Theater and the Selwyn and Harris Theaters—and the provision of new theater facilities and new entertainment related retail establishments. This should occur in a coordinated manner between Lake and Randolph Streets.
>
> In conjunction with development of a focus for cultural and entertainment facilities along an axis running from the Chicago Theater to the Selwyn and Harris Theaters, an arcaded or covered walkway or concourse would provide the necessary intimacy and human scale."

The 1982 Redevelopment Guidelines provided for up to 300,000 square feet of retail, cultural, and entertainment uses for block 36. It specifically provided, "[t]here are no minimum requirements for office space or residential space in the project area."

The 1982 Redevelopment Guidelines specifically mentioned seven buildings within the area, including the Oliver Building, as being "retained." However, the 1982 Redevelopment Guidelines provided that, as to these seven structures, "[t]he City can and will seek to have such structures incorporated into larger redevelopment parcels, permitting redevelopment on the overall parcel."

Further, "[w]hen existing structures are incorporated into or attached to new construction (such as grade pedestrian bridges), the developer must be sensitive to the impact on the character or 'personality' of the building being retained. The joining of old and new structures should be done with sensitivity to architectural functions, aesthetics and style in both structures without impairing basic goals or economic viability."

The facade of the Oliver Building is designated as a Chicago landmark and it will be retained after the Oriental Theater is assembled with the Oliver Building.

The Chicago city council turned to the TIF Act for assistance in funding the North Loop Redevelopment Plan. To permit the use of the TIF funds to finance North Loop Projects, the Chicago city council enacted TIF ordinances on June 20, 1984, creating the North Loop Tax Increment Redevelopment Project (1984 TIF Plan). The ordinances authorized acquisitions within the TIF district and stated the city council's intention not to diminish the prior authority to acquire structures in the Blighted Commercial Area North Loop, which was contained within the TIF district.

Under the heading "General Land Use Plan," the 1984 TIF Plan provided, "[t]his Redevelopment Plan conforms to and adopts the North Loop Guidelines for Conservation and Redevelopment approved by the City Council in October, 1982." It also provided, "[n]ew patterns of uses can be established: hotel and residential uses along Wacker Drive, entertainment and cultural facilities between Lake and Randolph Streets." Finally, under this same heading was contained, "Cultural and Entertainment Uses—Cultural and entertainment uses are permitted throughout the Redevelopment Project Area but should be concentrated in the blocks between Lake Street and Randolph Street, tying the Chicago Theater to the Selwyn/Harris Theaters."

Defendants point to language found under the heading "Phasing and Scheduling of Redevelopment Project" which provided that the third phase of the Redevelopment Project would include initiation of redevelopment activity within blocks 35 and 36:

> "*Block 36* Designated property within this block will be acquired, cleared and sold to a private developer for possible assembly with other not-to-be acquired property for construction of a mixed-use complex including approximately 300,000 square feet of retail, approximately 700,000 square feet of office and approximately 200,000 square feet of residential or hotel."

However, the initial language under the heading "Phasing and Scheduling of Redevelopment Project" also provided "[t]he representations as to amount of space required for usage are necessarily approximate and may be revised pursuant to negotiation between the City and developer, and in accordance with the General Land Use Plan provisions of the Redevelopment Plan and the minimum and maximum development requirements as contained in the *North Loop Guidelines for Conservation and Redevelopment* approved by the City Council in October, 1982."

■ In interpreting a statute, the primary rule of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature. *In re Application for Judgment & Sale of Delinquent Properties for the Tax Year 1989*, 167 Ill. 2d 161, 168 (1995). In order to determine the legislative intent, courts must read the statute as a whole, and all relevant parts must be considered. *People v. Lewis*, 158 Ill. 2d 386, 389 (1994). Each section should be construed in connection with every other section. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994). Courts should look to the language of the statute as the best indication of legislative intent, giving the terms of the statute their ordinary meaning. *In re Application for Judgment*, 167 Ill. 2d at 168. Where the statutory language is clear, courts should give effect to the statute as enacted without considering extrinsic aids for construction. *Bogseth v. Emanuel*, 166 Ill. 2d 507, 513 (1995).

The 1984 TIF Plan's definition of "general land uses" fully adopted the 1982 Redevelopment Guidelines which provided for block 36 to contain the "Theater Row Development," which called for new theater facilities to be provided. Further, the 1984 TIF Plan's general land uses provided for entertainment and cultural facilities to be concentrated in block 36.

■ Defendants' argument that "condemnation of the Oliver Building will produce an effect upon the land uses established for the Oliver Building and Block 36" under the 1984 TIF Plan and therefore violates the TIF Act is based on a misreading of the TIF Act. Section 11—74.4—5(c) imposes notice requirements when an ordinance is adopted that: (1) alters the exterior boundaries of the original ordinance; or (2) affects the *general* land uses established pursuant to the plan; or (3) changes the nature of the redevelopment project. 65 ILCS 5/11—74.4—5(c) (West 1994).

A plain reading of section 11—74.4—5(c) shows that the acquisition of the Oliver Building would have to affect the general land uses as determined under the 1984 TIF Plan and the 1982 Redevelopment Guidelines to trigger the notice requirements. Both plans' general land uses provided for new entertainment and cultural facilities to be located on block 36, tying the Chicago Theater to the Selwyn/Harris Theaters.

The Chicago Theater is on State Street and the Selwyn/Harris Theaters are on Dearborn Street. All three of these theaters are between Lake and Randolph Streets. The Oliver Building and Oriental Theater are in block 36 between Lake and Randolph and between State and Dearborn. The location of a new theater at the site of the Oliver Building and the Oriental Theater therefore "ties" the Chicago Theater to the Selwyn/Harris Theaters.

Defendants' argument that the condemnation of the Oliver Building changes the land use is based on a portion of the 1984 TIF Plan which referred to the Oliver Building as "rehabilitation without acquisition."

The same 1984 TIF Plan provides:

> "The City may determine that to meet the renewal objectives of this Redevelopment Plan, other properties in the Redevelopment Project area not scheduled for acquisition should be acquired, or certain property currently listed for acquisition should not be acquired."

The trial court said that it considered only the 1984 Plan in determining that the condemnation of the Oliver Building did not change the general land use.

While the trial court's ruling was correct, it should also have looked to the 1982 Redevelopment Guidelines since they were incorporated into the 1984 TIF Plan.

In addition to looking at the 1984 TIF Plan and the 1982 Redevelopment Guidelines to determine whether the condemnation of the Oliver Building affected the general land uses of the redevelopment project, we must also look at the scope of the project itself.

Since the beginning of the project, the City has acquired more than two dozen parcels of property, removing most blighted structures and transferring the acquired properties for redevelopment. The City's acquisitions have resulted in a dramatic revitalization of the area, including the construction of the Leo Burnett Building, the Renaissance Hotel, the Donnelly Building, the Loop Transportation Center and the North Dearborn Street Apartments.

The North Loop Development Area encompasses more than 26 acres of land, or approximately 1 million square feet. The Oliver Building covers approximately 4,000 square feet within this area. Thus, the Oliver Building property makes up .4% (4/1,000) of the area. A change in such a small part of a redevelopment area does not constitute a change in the general land use or a change in the nature of the existing TIF project. This is especially true here, given the language of the ordinances permitting acquisition and the stated intention of the 1984 TIF Plan to provide for theater and entertainment uses in the specific block in which the Oliver Building is located.

■ Defendants also argue that since the 1996 substitute ordinances say that the condemnation of the Oliver Building is necessary in order to assemble it with the Oriental Theater, the agreement between the City and Livent as to the renovation of the Oriental Theater must meet the requirements of the TIF Act as well or the City lacks the necessity to take the Oliver Building.

Defendant's efforts to contest this condemnation based on the allegation that another project did not meet the requirements of the TIF Act go against several long-standing principles of eminent domain law. The instant case is factually very similar to the case of *City of Chicago v. R. Zwick Co.*, 27 Ill. 2d 128 (1963). In that case, areas of the near west side of Chicago had been declared slum and blighted areas in 1956. Most of the area was cleared and plans were made for its redevelopment as a residential area. Early in 1961 an agreement was reached with the trustees of the University of Illinois for the university's Chicago campus to be located on some of these tracts. Traverses were filed on various grounds.

In affirming the trial court's actions in overruling these traverses, the Illinois Supreme Court held that land clearance in a slum area satisfies public use, so that the type of redevelopment has no relevance in a condemnation proceeding. Further, the court rejected the defendant property owners' assertion that since the City failed to comply with the federal Housing Act of 1949 (42 U.S.C. §§ 1441 through 1462 (1994)) and the project was being financed in part by federal money, the City's condemnation complaint should have been dismissed. The court cited the legal principle that "[a] condemnee has no legal interest in the source of a condemnor's funds." *Zwick*, 27 Ill. 2d at 132. The court further held that the federal Housing Act "did not confer any legal rights upon owners and residents in a slum clearance area, 'separate from their positions as members of the general public.' " *Zwick*, 27 Ill. 2d at 133, quoting *Harrison-Halsted Community Group, Inc. v. Housing & Home Finance Agency*, 310 F.2d 99, 104 (7th Cir. 1962).

In the instant case, defendants argue that we must first determine whether the agreement between the City and Livent as to the renovation of the Oriental Theater complied with the requirements of the TIF Act before we can say that the condemnation of the Oliver Building was a necessity.

The term "necessary," for purposes of condemnation proceedings, is subject to a definition other than that to which the term is subject in common discourse. *Department of Transportation v. Keller*, 127 Ill. App. 3d 976, 980 (1984). The Illinois Supreme Court has defined necessity with respect to the exercise of the power of eminent domain as meaning " 'expedient,' 'reasonably convenient' or 'useful to the public,' and cannot be limited to an absolute necessity. [Citations.] Conversely, the word 'necessary' does not mean 'indispensable' *** or 'an absolute necessity.' " *Department of Public Works & Buildings v. Lewis*, 411 Ill. 242, 245 (1952), cited in *Alsip Park District v. D&M Partnership*, 252 Ill. App. 3d 277, 287 (1993).

This court has recently addressed the issue of proving necessity in an eminent domain action filed under the TIF Act in *City of Batavia v. Sandberg*, 286 Ill. App. 3d 991 (1997). There it was held:

"The determination of necessity is a legislative function that should be given great deference by the trial and reviewing courts. *Department of Public Works & Buildings v. Keller*, 61 Ill. 2d 320, 325 (1975). Specifically, in regard to actions to acquire property under the [TIF] Act, it is not for a court to interfere with the legislative determination unless there is a showing of a clear abuse of discretion by the municipality. See *Village of Wheeling v. Exchange National Bank*, 213 Ill. App. 3d 325, 334 (1991). The general rule, as stated in *City of Chicago v. Vaccarro*, 408 Ill. 587, 597 (1951), is 'that where the legislature has delegated to a corporation the authority to exercise the power of eminent domain, the corporation has also the authority to decide on the necessity for exercising the right, and its decision will be conclusive in the absence of a clear abuse of the power granted.'" *Batavia*, 286 Ill. App. 3d at 1003-04.

Here, defendants do not argue that the renovation of the Oriental Theater will not satisfy the goals for the redevelopment of the North Loop nor do they question the public purpose of such renovation. They argue that the renovation of the Oriental Theater changed the general land uses of block 36 and therefore the notice requirements of section 11—74.4—5 of the TIF Act had to be complied with. In the absence of this compliance, the renovation project was unlawful.

The trial court found that the issue of whether TIF procedures were properly followed as to the renovation of the Oriental Theater was not before it in this eminent domain case. The trial court pointed out that the City based its condemnation complaint upon its home rule powers. The trial court found that the City's condemnation complaint could have been based on the authority provided under commercial renewal and redevelopment areas or under business district development and redevelopment (65 ILCS 5/11—74.2—3 (West 1994)). The trial court correctly held that the City could have condemned the Oliver Building under the TIF Act as well. It held that these powers to condemn are concurrent and that a municipality has the right to choose under which particular section the condemnation will proceed. Based on our finding that the condemnation of the Oliver Building did not change the general land use or the nature of the redeveloping project, we need not decide this issue.

Defendants cite *Henry County Board v. Village of Orion*, 278 Ill. App. 3d 1058 (1996), for its holding that a city ordinance changing a redevelopment plan could be invalidated for failing to follow the no-

tice procedures of sections 11—74.4—5(a) and (c) of the TIF Act. In that case, the village had added an industrial park to a previously announced redevelopment plan and the village increased the private developer's monies by 5%. The appellate court agreed with the plaintiff taxing districts affected by these changes that the notice requirements of the TIF Act had to be complied with. We find this case to be inapposite. Here, no taxing district is complaining as to any lack of notice and both the 1984 TIF Plan and the 1982 Redevelopment Guidelines provided for entertainment uses in block 36.

■ When a party challenges a municipality's TIF ordinances, that party is required to overcome the ordinances' presumptive validity by clear and convincing evidence. *Castel Properties, Ltd. v. City of Marion*, 259 Ill. App. 3d 432, 439 (1994). Clear and convincing evidence is that "quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition [stated]." *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995). The fact finder's determinations will not be disturbed unless clearly contrary to the manifest weight of the evidence. *Reed-Custer Community Unit School District No. 255-U v. City of Wilmington*, 253 Ill. App. 3d 503 (1993). The decision of the trial court is against the manifest weight of the evidence if a review of the record clearly establishes that the decision opposite to the one reached by the trial court was the proper result. *Henry County Board*, 278 Ill. App. 3d at 1062, citing *In re Knapp*, 231 Ill. App. 3d 917 (1992).

■ The trial court in this case determined that the City's acquisition of the Oliver Building was necessary and in conformance with the TIF Act, and defendants have not shown these determinations to be contrary to the manifest weight of the evidence.

The defendants' argument that the taking of the Oliver Building was "unnecessary" because the agreement between the City and Livent for the renovation of the Oriental Theater violated the TIF Act is contrary to the holding in *City of Batavia v. Sandberg*, 286 Ill. App. 3d 991 (1997), as it relates to the determination of necessity. After our review of the record, and applying the above principles of law to the facts, we find that the defendants failed to overcome the presumption of the validity of the 1996 substitute ordinances through clear and convincing evidence.

As to defendants' assertions that the City failed to provide them with the requisite certainty that the Oliver Building was at risk of condemnation, we disagree.

In rejecting defendants' argument on this issue, the trial court cited the 1979 ordinance, which declared the North Loop Develop-

ment Area a blighted commercial area. This ordinance provided that the Oliver Building's status as "not to be acquired" would change where its exclusion would have a detrimental effect on the redevelopment of the abutting property. The court cited the 1982 ordinances in which the City authorized the acquisition of buildings under identical language as used in the 1979 ordinance. The trial court cited the 1984 TIF Plan, which provided that "[t]he City may determine that to meet the renewal objective of this redevelopment plan, other properties in the redevelopment project area not scheduled for acquisition should be acquired or certain property currently listed for acquisition should not be acquired." We agree with the trial court's finding that these plans were not vague, uncertain or indefinite as the defendants argue.

The City argues that every owner holds property with the knowledge that it might be acquired for public purposes. "[E]very private owner of property holds his title subject to the lawful exercise of the sovereign power of eminent domain." *Deerfield Park District v. Progress Development Corp.*, 22 Ill. 2d 132, 137 (1961).

The owners assert that a city ordinance must provide a property owner with the requisite certainty about whether his property is at risk of being condemned and that, if it fails to do so, the ordinance violates due process guarantees, relying on *City of Wheaton v. Sandberg*, 215 Ill. App. 3d 220 (1991), *appeal denied*, 142 Ill. 2d 666 (1991).

In *City of Wheaton*, the appellate court reviewed a village ordinance that required only "vacancies in all or part of any building" as a factor to qualify an area as "blighted." The appellate court found the phrase "vacancies in all or part of any building" to be vague and overly broad. *City of Wheaton*, 215 Ill. App. 3d at 227. The appellate court pointed out that almost all commercial buildings are partially vacant at one time or another. The court held that the language of the village ordinance differed from the requirements listed in the Commercial Renewal and Redevelopment Areas Act (735 ILCS 5/11—74.2—2(b) (West 1994)) in determining whether an area is a commercial blighted area which qualified for redevelopment. *City of Wheaton*, 215 Ill. App. 3d at 228.

In the instant case, there is no question raised as to whether the North Loop Area is a blighted commercial area. The Chicago city council found it to be so in 1979, 1982, 1983, 1984 and again in 1996. Defendants do not contest the designation of this area as being a blighted commercial area. Further, the ordinances applicable to the "Blighted Commercial District North Loop" clearly put defendants on notice that the Oliver Building could be condemned. The property was located in a blighted commercial district which was being

redeveloped since at least 1979. The Oliver Building abutted another piece of property that had not yet been developed. All of these facts gave notice to defendants that the Oliver Building could be condemned.

■ Finally, defendants contend that the City cannot acquire the Oliver Building by "quick take" because the provisions of section 7—103(12) of the Illinois Code of Civil Procedure are unconstitutional special legislation. Section 7—103(12) of the Code of Civil Procedure (735 ILCS 5/7—103(12) (West 1994)) provides:

> "In any proceeding under the provisions of this Article as follows:
>
> * * *
>
>> (12) after receiving the prior approval of the City Council, by a municipality having a population of more than 500,000 for the purposes set forth in Section 11—61—1A and Divisions 74.2 and 74.3 of Article 11 of the Illinois Municipal Code, and for the same purposes when established pursuant to home rule powers;
>>
>> * * *
>
> the plaintiff, at any time after the complaint has been filed and before judgment is entered in the proceeding, may file a written motion requesting that, immediately or at some specified later date, the plaintiff either be vested with the fee simple title (or such lessor estate, interest or easement, as may be required), to the real property, or specified portion thereof, which is the subject of the proceeding, and be authorized to take possession of and use such property ***."

Defendants argue that because it only applies to cities with population exceeding 500,000 (the City of Chicago), subsection (12) designates Chicago as a special class in violation of the provision prohibiting special legislation. They point out that a population classification "will survive a special legislation challenge only (1) where founded upon a rational difference of situation or condition existing in the persons or objects upon which the classification rests, and (2) where there is a rational and proper basis for the classification in view of the objects and purposes to be accomplished." *In re Petition of the Village of Vernon Hills*, 168 Ill. 2d 117, 123 (1995).

The trial court found that the difference-of-situation or condition prong of this test was met by the difference in density of the central business area in Chicago as compared to elsewhere in Illinois and that this difference was a rational one. The court also found that the difference in the size of the buildings and the numbers of tenants in those buildings were rational differences supporting a population classification for the quick-take statute.

The trial court found that as to the second prong of the test, there was a rational basis for the population classification in view of the purposes to be accomplished. The court found that it is a proper goal to redevelop blighted areas as quickly as possible and that, in Chicago, the large numbers of tenants in buildings to be redeveloped will mean that it will take a longer time to relocate them. The trial court also found that it would take a longer time to demolish or renovate buildings in Chicago because of their size. Finally, the trial court found that due to the size of the buildings in Chicago, it is often more difficult to determine who the interested parties are and to determine how the compensation is to be divided among the owners and the tenants. The complexity of the financing of the redevelopment projects within Chicago also makes the issue of timing extremely important. The City also points out that nowhere else in Illinois is there likely to be such a large commercially blighted area, with many similar projects located almost side by side.

As early as 1930, the Illinois Supreme Court held that population classifications distinguishing Chicago from the rest of the state are presumed valid and will be voided only when found to be clearly arbitrary. *Mathews v. City of Chicago*, 342 Ill. 120 (1930).

It has also recently held, "legislative action that focuses on a specific area of the State will be upheld if a rational basis exists for distinguishing that area from the rest of the State." *Cutinello v. Whitley*, 161 Ill. 2d 409, 419-20 (1994). Also, "[the rational basis test] requires only that there be a reasonable relationship between the challenged legislation and a *conceivable*, and perhaps unarticulated, governmental interest." (Emphasis added.) *Cutinello*, 161 Ill. 2d at 420.

We find that the trial court's reasoning was correct and we reject defendants' contention that the quick-take provisions of the Code of Civil Procedure are unconstitutional special legislation.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

THEIS and ZWICK, JJ., concur.