Henry Clay Greenberg, J.
This is an action brought by private cartmen against the City of New York and its license commissioner to declare invalid and enjoin the enforcement of a certain implementing regulation promulgated by the commissioner pursuant to the provisions of the recently enacted No. 29 of the 1956 Local Laws of the City of New York dealing with the problem of commercial refuse removal. Defendants have moved to dismiss the complaint on the ground that it fails to state a cause of action.
Plaintiffs do not challenge the law itself nor any of its provisions, including the power conferred on the commissioner to fix rates, to subpoena witnesses, to investigate the affairs of licensees, and to issue regulations. Their attack is directed solely to one specific regulation, section 8 of the regulations of the commissioner, which requires the cartmen licensed to remove commercial refuse to enter into written contracts with their customers before commencing to do business with any of them, to deliver a signed copy thereof to each customer, and to file with the department of licenses a separate memorandum containing the terms of each contract, signed by the licensee and the customer, on forms supplied by the department. Plaintiffs charge that the commissioner exceeded his authority in promulgating this regulation; and that it is an oppressive and illegal reauirement. Defendants, however, contend that the regulation is *817 within the rule-mating power directly conferred upon the commissioner by the local law and is a reasonable and appropriate means for providing close supervision over the activities of licensed cartmen and facilitates the enforcement of that law; and therefore urge that the complaint should be dismissed for legal insufficiency.
A comprehensive view of this problem must take into account events and conditions which form the background for the enactment of this law, these being matters of record or public knowledge. The propriety of an enforcement measure can best be judged with relation to the nature of the evil it is intended to eliminate.
The collection and disposal of garbage and waste products is quite obviously a function which is vitally essential for the maintenance of public health and safety. A municipality may perform the function of removal directly through its own department; or it may have it performed under a public contract; or it may require a license to be obtained by persons or firms authorized and qualified to perform that function. “It is for the municipality, within reasonable bounds, to determine how they shall be collected and removed, or rendered harmless ” (City of Rochester v. Gutberlett, 211 N. Y. 309, 316). But it still has the duty to exercise such supervision and control as will prevent danger to public health and injury to the public interest.
In the city of New York the disposal of garbage and waste products has been the function of its sanitation department, all collections of such refuse being required to be delivered to its disposal plants, thus ensuring the elimination of any dangerous conditions. Collections, however, have for many years been on a somewhat different basis. The department has been collecting refuse only from residential buildings, leaving to private cartmen the collection of waste from commercial and industrial buildings, subject to rather lenient supervision. (There are, of course, somewhat different problems involved in the pick-up of refuse from commercial buildings in a business district than prevail with regard to residential buildings.) There have been for years numerous complaints from private industry concerning the excessive prices imposed by these cartmen as a result of their being organized in associations, operating in specific areas and refusing to serve customers outside their own areas. Dissatisfaction was also expressed with regard to the discriminatory practice of collection of trade waste without charge by the city from approximately 52,000 commercial businesses solely because of their location in residential buildings, while about 70,000 commercial and industrial concerns located in business buildings were obliged to pay private cartmen for the same service.
The entire subject has been a matter of public concern for some time. . Investigations have been conducted and reports made by *818 the city administrator, the bureau of the budget, the department of investigation and the department of sanitation. Finally, a special committee of three eminent private citizens was appointed by the mayor at the request of the Board of Estimate to study this trade waste problem. Their recommendation was that the city treat all commercial establishments alike and discontinue its free service to commercial establishments located in residential buildings. Concerning the matter of remedying abuses in the cartman industry, they recommended that, since 52,000 additional establishments would then be required to avail themselves of the services of the private cartmen, thus aggravating the conditions tending toward overcharging and possible monopolistic practices, cartmen should be licensed and regulated by the department of licenses, which should be empowered to establish maximum rates for the various types of collection service furnished and to adopt rules and regulations governing the operation of the business of private cartmen and the maintenance of records of their activities.
These recommendations have been embodied in Local Law No. 29, effective July 1, 1956. It provides that it shall be unlawful for any person to engage in the operation of a business for the collection or disposal of garbage, refuse or trade waste without having first obtained a license, which shall be granted “to a person of good character, in accordance with the provisions of this article and the rules and regulations of the commissioner”. The principal provisions of the law are contained in the following two sections:
“ § B32-269.0 Rate fixing; hearings; records.— a. No licensee shall charge, exact or accept rates for the collection or removal of refuse or other material described in subdivision a of section B32267.0 any amount in excess of the maximum rates fixed pursuant to this section.
“ b. The commissioner shall have the power to fix and from time to time refix maximum rates for the removal of such refuse or other material or any class thereof by a license, which rates shall be based upon a fair and reasonable return to the licensees and shall protect those using the facilities of such licensees from excessive or unreasonable charges. Such rates may be fixed and from time to time refixed by the commissioner after a public hearing, five day notice of which shall be published in the City Record. Interested persons shall have the right to appear at such hearings and adduce evidence in regard to the subject matter thereof. The commissioner may compel the attendance of licensees and other persons having information in then- possession in regard to the subject matter of such hearings and compel the production of books and records in relation thereto, and may require licensees to file with him schedules of rates.
*819 “ c. The commissioner may require licensees and permittees to keep such records as he may determine are necessary or useful for carrying out the purposes of this article.”
“ § B32-271.0 Regulations. — ■ The commissioner may promulgate such rules and regulations as may be necessary to control the conduct of licensees and permittees, to afford reasonable collection facilities and to carry out the provisions of this article and copies of such rules and regulations shall be filed with the City Council prior to promulgation.”
Pursuant to the authority vested in him by the law the commissioner immediately held a public hearing on the subject of fixing of maximum rates and promptly thereafter promulgated a group of 16 regulations to take effect July 1, 1956 simultaneously with the local law. Section 16 of the regulations provided “ maximum rates for licensees using compactor type trucks ” (the principal type used by cartmen). The complexity of the problem becomes apparent when it is realized that maximum rates for other types will have to be established after a complete survey and subsequent public hearings and that the present limited regulation establishes varying maximum rates dependent on many different factors, such as amount of waste products measured by cubic yards or different sizes of receptacles, distance of pick-up from building line, necessity to walk up or down stairs or use elevators, etc.
Section 13 of the regulations seeks to remedy the alleged abuse of arbitrary refusal by cartmen to service customers who do not submit to their excessive demands. It prorides that whenever a prospective customer has been unable to agree with a licensee upon the terms and conditions for removal of refuse or waste, the commissioner may require a licensee operating in or near the area to collect such waste at the maximum rate set forth in the regulations; and that no such licensee shall refuse to collect from a customer who is willing to pay that maximum rate.
The sole attack of this complaint, as previously noted, is confined to section 8 of the regulations, which requires licensees to enter into written agreements with their customers, leaving a signed copy with them, and to file a form memorandum containing the terms of each contract, also signed by both parties.
Since the local law expressly conferred upon the commissioner the power to fix and refix maximum rates, to “ promulgate such rules and regulations as may be necessary to control the conduct of licensees ” and to “ require licensees * * * to keep such records as he may determine are necessary or useful for carrying out the purposes of this article”, the only issue presented is whether the challenged regulation is a reasonable exercise of the delegated *820 function or, as plaintiffs maintain, is invalid as an illegal and unconstitutional requirement that contracts between licensees and customers must be incorporated in a signed writing and filed in a public office where competitors may inspect them.
It has long since been settled that freedom of contract is subject to “ regulation which is reasonable in relation to its subject and is adopted in the interests of the community ” (West Coast Hotel Co. v. Parrish, 300 U. S. 379, 391), where the business concerned is “affected with a public interest”. Such a business comes under the police power of a state or city when it has “ been devoted to a public use and its use thereby, in effect, granted to the public”. (Tyson & Brother v. Banton, 273 U. S. 418, 434.) This evolving concept has also been applied to validate price and rent control legislation when, through a combination of circumstances, there has been a break-down in the normal interplay of the forces of competition so that large segments of the public are placed at such a disadvantage in the bargaining process that the community as a whole might reasonably be expected to be seriously affected.
Here we have not merely a business affected with a public interest but one which is in the public domain itself. “ The gathering of garbage is not a trade, business or occupation, but it is a public duty ” (7 McQuillin on Municipal Corporations [3d ed.], p. 90). That duty is performable, at the city’s option, by an exclusive licensee under contract or by a limited number of licensees, whichever method or, as in this case, combination of methods is deemed most efficient. Even where licensees are engaged in this activity, “it is primarily governmental in nature and object, although private enterprise is utilized in performing it ” (9 McQuillin on Municipal Corporations [3d ed.], p. 307). The licensees must be regarded as quasi-agents of the city in performing its duty to the public.
The city has the right, indeed the duty, of close supervision of the licensed cartmen both with regard to the manner of their performance in its place and stead of this governmental function and the prices charged therefor. In view of the many different factors entering into the price structure it was within its competence to provide that the commissioner fix and refix maximum prices for the various types of service furnished after due notice and public hearings — and that delegation, it should be noted, is not here attacked. The maximum rates to be fixed, it was explicitly directed, “ shall protect those using the facilities of such licensees from excessive or unreasonable charges”, and the commissioner was given the express power to promulgate regulations necessary to control the conduct of licensees and to carry out the provisions of the law.
*821 The challenged regulation is a measure reasonably designed for the protection of the numerous customers, such as small storekeepers, who might not be aware of the maximum prices to which the licensees were limited as well as for a more efficient and economical enforcement by the commissioner’s staff of the maximum price regulation, dispensing with the necessity of hiring a great number of additional inspectors to verify the prices allegedly being charged by the licensees.
As a matter of fact, this regulation does not restrain freedom of contract except that it requires whatever contract is agreed to by the parties be set forth in a signed writing. It does not require that contracts be for any specified period. It is clear that the intent and effect of the regulation is merely to aid in the proper enforcement of the maximum price regulation.
The argument advanced by plaintiffs that customers frequently refuse to enter into written agreements is untenable when we consider that the parties are free to make any contract so long as the charges are within the maximum prices. Since the regulation is for their protection, it is incredible that any appreciable number of customers would refuse to enter into some writing evidencing the terms of their understanding, particularly when all other customers and all other licensees are subject to the same requirement. The further argument based on the fear that their competitors may be able to learn the terms of their contracts is likewise deemed insubstantial. The essential feature of those contracts is the price charged and this would be, for all practical purposes, the maximum prices stated in the regulations. From a realistic point of view, considering the nature of this business and the method of operation by territories, this argument must be rejected.
The only serious question, as the court views it, is one of law: Does the regulation constitute an improper assumption of legislative power by an administrative officer?
The commissioner has here acted not merely by virtue of the general power granted by section 885 of the Charter of the City of New York to make rules and regulations for the conduct of his department and to carry out its powers and duties, but pursuant to an express delegation in the local law to carry out its stated purposes. We have instances of such delegation of implementary power in the rent control laws administered by the rent commission and the Public Service Law by the Public Service Commission. There may not, of course, be a complete delegation of legislative power. The question as to whether a “ Legislature may delegate authority to an administrative body to carry out legislative policies ” is to be “ construed with reference to the general purposes and the subject-matter ” of the particular law involved “ and if it *822 may be logically found that the criterion of ‘ public interest ’ is directly related and limited to the general purposes of such law then it is a sufficient guide. * * * The Legislature is not required to furnish details but only to provide a general guide for administrative action ” (Matter of International Ry. Co. v. Public Service Comm., 264 App. Div. 506, 510, affd. 289 N.Y. 830). To satisfy the requirement of due process it is only necessary “ that the means selected shall have a real and substantial relation to the object sought to be attained ” (Nebbia v. New York, 291 U. S. 502, 525).
Judged in the light of this basic principle of “ public interest ” as defining the permissible Emits of administrative regulatory power, it is clear that this regulation neither offends due process nor violates the rule against improper assumption of legislative power. It was entirely proper for the city to provide a general guide for the control of the cartmen who were to be Ecensed to perform on its behalf a governmental service and to authorize the commissioner of Ecenses to make the detailed regulations to carry out its provisions. Considering the complexity of the problem of fixing and enforcing maximum prices and the need for close supervision of the prices being charged by the Ecensees, it was within bis power and the intendment of the local law to determine that the requirement of a written contract was “ reasonably necessary for the accompEshment of the purpose and not unduly oppressive upon individuals ” (Fisher Co. v. Woods, 187 N. Y. 90, 94).
Matter of Executive Service Corp. v. Moss (256 App. Div. 345) cited by plaintiffs, is clearly distinguishable on several counts. It was there held that the license commissioner had wrongfully exercised legislative power when he insisted that a written contract for a period of one year or more between a prospective employee and employer was necessary before a Ecensed employment agency could claim, in accordance with the provisions set forth in section 185 of the General Business Law, a fee in excess of the first week’s wages. That section set forth detailed provisions as to the fee to be charged under varying circumstances, permitting, in one situation, a fee in excess of the first week’s wages when “ the period of employment is for at least one year, and at a yearly salary ” (L. 1910, ch. 700). The commissioner subsequently imposed the requirement that such a hiring had to be in writing.
The Legislature did not expressly confer in article 11 of the General Business Law deaEng with “ Employment Agencies ” any authority on the commissioner to make regulations to carry out its provisions and the sole source of power for this added requirement was the general rule-making power of section 885 of the charter. Article 11 consists of some 24 sections covering in detail various phases of the operation of employment agencies; it was obviously *823 intended as a. comprehensive law on the subject. The commissioner’s requirement of a written contract before an agency could claim the fee which section 185 stated was to be paid it, was clearly an attempt to amend a law in the guise of administrative regulation. Nothing in article 11 could even remotely suggest that the Legislature intended to grant such power to the commissioner.
The situation here is entirely different. Local Law No. 29 confers the power in broad terms not only to fix maximum prices but to make regulations to enforce them. The requirement here as to a written contract is for the sole purpose of assuring that the maximum price regulation is being observed and not, as in the employment agency situation, to bar recovery of a fee even though the condition laid down in the statute has been satisfied. Moreover, we are dealing here with the performance of a governmental function with the consequent right on the part of the authorities to invoke the highest powers of investigation and supervision.
This regulation is not arbitrary or unreasonable. The discretion reposed in the commissioner to make rules governing the conduct of licensees and for the protection of the general public as well as the numerous customers of the cartmen, including the 52,000 being turned over by the city to them as prospective clients, gave him the authority to determine that this measure would be of aid in the enforcement of the law, and in the absence of a clear showing of arbitrariness or substantial injury should not be disturbed by the courts. What he has done amounts to no more than regulation.
The motion|is\accordingly granted and the complaint dismissed.