BOARD OF EDUCATION OF COMMUNITY HIGH SCHOOL DISTRICT No. 218, Plaintiff-Appellant, v. THE VILLAGE OF ROBBINS, Defendant-Appellee.

First District (5th Division)   No. 1—00—2704

Opinion filed November 30, 2001.—Rehearing denied February 5, 2002.—Modified opinion filed February 8, 2002.

600

James P. Bartley and Thomas M. Melody, both of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant.

Mark H. Sterk, of Odelson & Sterk, Ltd., of Evergreen Park, and Sperling & Slater, P.C., of Chicago (Greg Shinall and Stephen J. Spitz, of counsel), for appellee.

JUSTICE GREIMAN delivered the opinion of the court:

Defendant-appellee, the Village of Robbins (Village or Robbins), established a tax increment financing (TIF) district for land that was to house an incinerator. Plaintiff-appellant, the Board of Education of High School District No. 218 (Board or plaintiff), along with coplaintiffs, a local elementary school district and a community college district, challenged the adoption of TIF by the Village, claiming that the proposed site violated both the Tax Increment Allocation Redevelopment Act (65 ILCS 5/11—74.4—1 et seq. (West 1994)) (the TIF Act), and the Industrial Project Revenue Bond Act (65 ILCS 5/11—74—1 et seq. (West 1994)) (the Bond Act).[1] The circuit court entered summary judgment in favor of defendant on counts II through VI and count IX of plaintiff's amended complaint and conducted a bench trial on the remaining counts I, VII, VIII, and X. The court then entered final judgment on all counts in favor of defendant, and

---

[1]The Board is the only plaintiff that chose to pursue its right to appeal.

the Board now appeals the court's disposition of all 10 counts. The only question on the pleadings is whether the defendant should have been allowed to amend its answer to plaintiff's complaint after the trial was completed. For the reasons that follow, we affirm the trial court's dismissal of all 10 of plaintiff's claims.

Robbins is an impoverished community located south of Chicago in Cook County, Illinois. Plaintiff is a school board whose taxing district includes parts of the Village, including some of the real property at issue. In the case below, plaintiff challenged the Village's use of TIF in connection with the financing and construction of a $400 million waste-to-energy facility on a site located west of Kedzie Avenue and south of the Cal Sag channel (the Cal Sag site). Mainly, it argued that it was adversely affected by the Village's designation of the site as a redevelopment project area (RPA).

"Under the TIF Act and city ordinances, taxes on incremental increases in the equalized assessed value of property within the TIF district are to be collected by the county treasurer, remitted to the city treasurer, deposited into a special allocation fund and spent on statutorily approved expenses of the TIF district." *In re Application of the County Treasurer & ex officio County Collector of McDonough County*, 283 Ill. App. 3d 913, 914 (1996). In other words, the TIF Act authorizes municipalities to encourage redevelopment of blighted property by freezing real estate taxes and offering the developer the value of future incremental property taxes to be generated as a result of improvements to the property. As the trial court noted, "[w]hile the TIF Act speaks in terms of depositing the incremental taxes in a special fund and using them to pay eligible project costs, the practical effect of using TIF is to cap—at pre-improvement levels—the real estate taxes on the property for up to 20 years." The plaintiff, which would otherwise be receiving a portion of the incremental taxes from the Cal Sag site, sought a declaratory judgment that the Village's ordinance designating the property as an RPA violated the TIF Act.

Most of the relevant facts are undisputed. In as early as 1983, the Village sought to bring a waste-to-energy facility to the Cal Sag site. In its efforts to attract such a facility, the Village began offering TIF and other economic incentives. After one developer failed to proceed, the Village began to negotiate with Reading Energy (Reading) and, in 1988, entered into a written development agreement. In that agreement, the Village agreed to provide Reading with economic incentives, including TIF, to induce the construction of an incinerator at the Cal Sag site. The Village passed, by resolution, the 1988 development agreement on December 27, 1988.

In the next few years, Reading (with the Village's assistance)

conducted a significant amount of work that needed to be completed before the facility could be financed and built. Some of this work included acquiring the approximately 100 parcels of land comprising the site, obtaining siting permits, developing engineering and architectural plans, securing environmental approvals, pursuing waste tipping contracts with other municipalities and waste haulers, and entering into conditional electricity and recycling contracts.

However, even with the Village's promise to provide TIF (along with millions of dollars of municipal bond financing), it became apparent that Reading could not finance or construct the facility on its own. Consequently, Reading contracted with Robbins Resource Recovery Partners (RRRP), a subsidiary of Foster Wheeler Corporation (FW, and collectively, FW/RRRP or the developer). FW/RRRP's involvement was necessary because it had the required technology, the engineering and operations expertise, adequate capital, and the necessary experience and reputation to attract an estimated $300 million from the financial community. Plaintiff never disputed that Reading could not have completed the project on its own.

In August of 1994, FW/RRRP informed the Village in writing that it was relying upon, and could not reasonably anticipate proceeding without, the TIF support that had been promised to Reading. Similarly, Smith-Barney, which underwrote the bond financing for the project, informed the Village in writing that there was a significant risk that the project could not be financed even with the TIF support and that such a risk would be "materially greater" without the pledged TIF revenues.

No other developers ever expressed an interest in the Cal Sag site or any other site in Robbins. In fact, as of 1994, the Village had no commercial or industrial businesses and could not, despite substantial efforts, attract even a gas station, convenience store, or dry cleaner. Accordingly, on August 30, 1994, the Village passed the TIF ordinance. In so doing, the Village relied upon, *inter alia*, (i) the blighted condition of the Cal Sag site and the rest of the Village; (ii) the poor economic condition of the Village; (iii) the absence of any growth and development, or reasonable prospects of growth and development, at the site or in the rest of the Village; (iv) the 1988 development agreement and the developer's reliance thereon; (v) the lack of any other interest in the site; and (vi) the written communications from the developer and the underwriter confirming the need for the TIF. The Village also relied upon numerous consultants and attorneys, including nationally recognized TIF experts, who all concluded that TIF was necessary and proper.

Thereafter, the Village issued $385 million in industrial develop-

ment bonds, pursuant to the Bond Act, to finance the construction of the facility. It then entered into a mortgage agreement under which it pledged the incremental revenues it would have received to pay principal and interest on the bonds. Included in that pledge was "the present and continuing right to make claim for, collect, receive and receipt for any Incremental Taxes, and to bring actions and proceedings for the enforcement of its rights with respect thereto." Further, Robbins covenanted as follows:

"As long as any Series 1994A Bonds are Outstanding, the Issuer will continue to deposit the Incremental Taxes into the Special Tax Allocation Account. The Issuer covenants and agrees with the Series 1994A Bondholders that so long as any Series 1994A Bonds remain outstanding, the Issuer will not take any action or fail to take any action which in any way would adversely affect the ability of the Issuer to collect the Incremental Taxes."

The bond proceeds were used to finance the construction of the facility, the outfitting of the facility, and the reimbursement to RRRP for prior development costs.

Robbins then entered into several leases and agreements with RRRP whereby RRRP agreed to pay rent and other benefits to the Village, all of which were dated September 15, 1994, and adopted by resolution. The rents the developer agreed to pay the Village for the period under TIF (1997 through 2016), as determined by the Village's financial consultant, added up to $65,950,280.

Plaintiff brought suit on September 28, 1994, and in its amended 10-count complaint it argued: that the Village's finding that the RPA was not subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be adopted without TIF was erroneous (count I); that the redevelopment plan approved and adopted by the Village did not satisfy the statutory requirements of the TIF Act for redevelopment plans in general (count II); that the leases and other agreements between the Village and the developer were void (count III); that the facility is a tax-exempt facility, and as such, the Village's redevelopment plan would not enhance the tax base of the underlying districts (count IV); that the joint review board was not provided with sufficient information by the Village to make its statutory determination as to whether the proposed redevelopment satisfied the required eligibility criteria (count V); that the Village did not hear and determine the objections at the public hearing, as required by statute (count VI); that section 11—74.4—7.1 of the TIF Act required the Village to agree to pay the other taxing districts 25% of the cost of the building (count VII); that the Village has improperly utilized TIF because it failed to adopt an ordinance

and provide for the distribution of surplus in the special TIF fund, because the facility is a private building and is not eligible for TIF, and because tax increment revenues cannot be used to cover prior development costs (count VIII); that the Village never had a comprehensive plan, as required by statute (count IX); and that under section 11—74.4—10 of the TIF Act, the Village was required to deposit revenues received from its leases with the developer into the special TIF fund (count X).

Prior to trial, the court considered plaintiff's motion for summary judgment on counts II, III, and V through IX, and defendant's motion for summary judgment on counts I through IX. Plaintiff also moved to strike the affidavit of the mayor of Robbins. The court struck the affidavit, granted summary judgment to defendant on counts II through VI and count IX, but denied defendant's motion with respect to counts I, VII, and VIII. Plaintiff's motion was denied as to all counts. Consequently, the only issues raised at trial were with respect to counts I, VII, VIII, and X. The case was tried in October and November of 1999. On July 12, 2000, the court entered an order finding for the Village on the remaining counts. In the proceedings before us, defendant has appealed the court's entry of summary judgment on counts II through VI and count IX, as well as its July 12, 2000, judgment on the remaining counts. Moreover, plaintiff now argues that the Village's expert witness, Patricia Curtner, should not have been allowed to contribute to counsel's closing argument after trial and that Robbins should not have been allowed to amend its answer to plaintiff's complaint after trial. In the interests of economizing space, our opinion will address only those issues that have the most direct impact on the trial court's decision. Accordingly, our discussion of the remaining issues will be nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

Regarding the issues that were decided at trial, we first note that the parties disagree as to our standard of review. Plaintiff argues that because these issues all entail the trial court's interpretation of the relevant statutes and their application to the facts, the trial court was engaged in questions of law, which are subject to a *de novo* review. See *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 554 (1998). As further support for this standard, plaintiff continues, this court is being asked to construe several provisions of the TIF Act and the Bond Act—in many instances as a matter of first impression.

Defendant responds that with respect to the remaining issues, they were decided after a trial in which the court made numerous findings of fact. Specifically, the court found that the Cal Sag site was blighted, had not been subject to growth and development through

investment by private enterprise, and would not be reasonably anticipated to be developed without the adoption of the TIF redevelopment plan. Moreover, it cites *City of Chicago v. Boulevard Bank National Ass'n*, 293 Ill. App. 3d 767 (1997), for the proposition that the Village's ordinances have a presumption of validity. There, this court stated:

> "When a party challenges a municipality's TIF ordinances, that party is required to overcome the ordinances' presumptive validity by clear and convincing evidence. *Castel Properties, Ltd. v. City of Marion*, 259 Ill. App. 3d 432, 439 (1994). Clear and convincing evidence is that 'quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition [stated].' *Bazydlo v. Volant*, 164 Ill. 2d 207, 213 (1995)." *Boulevard Bank*, 293 Ill. App. 3d at 780.

Accordingly, defendant claims that the proper standard of review is for this court to determine whether the trial court's findings were against the manifest weight of the evidence.

While the defendant is correct as to the proper standard, it is only partially accurate as to why it is to be applied. To be sure, the trial court made findings of fact in rendering its decision. It is well established that on appeal, a trial court's findings will not be set aside unless clearly contrary to the manifest weight of the evidence. *Reed-Custer Community Unit School District No. 255-U v. City of Wilmington*, 253 Ill. App. 3d 503, 508 (1993). However, in both parties' arguments regarding whether the ordinances are otherwise presumptively valid, it appears that they have confused the effect of a presumption with the standard of judicial review in the circuit court. Plaintiff argues that "[o]nce a party introduces sufficient evidence to rebut a presumption, the 'bubble bursts' and the presumption disappears." *Reed-Custer*, 253 Ill. App. 3d at 508, citing *In re Estate of Kline*, 245 Ill. App. 3d 413, 424 (1993). Nonetheless, to overturn a TIF ordinance, plaintiff must prove by clear and convincing evidence an abuse of discretion by the municipality. *City of Batavia v. Sandberg*, 286 Ill. App. 3d 991, 1003-04 (1997).

■ Such propositions, however, have nothing to do with the standard of review before this court. In the present case, the presumption existed that Cal Sag site was blighted, had not been subject to growth and development through investment by private enterprise, and would not be reasonably anticipated to be developed without the adoption of the TIF redevelopment plan. Regardless of whether plaintiff was able to introduce evidence to the contrary to vanquish that presumption, the trial court determined that plaintiff had not met its burden of proof in showing, through clear and convincing evidence, that the

municipality had abused its discretion in passing the relevant TIF ordinances. And, with regard to this court, "[t]he fact finder's determinations will not be disturbed unless clearly contrary to the manifest weight of the evidence." *Boulevard Bank*, 293 Ill. App. 3d at 780, citing *Reed-Custer*, 253 Ill. App. 3d at 508. Accordingly, "[t]he decision of the trial court is against the manifest weight of the evidence if a review of the record clearly establishes that the decision opposite to the one reached by the trial court was the proper result [citations]." *Boulevard Bank*, 293 Ill. App. 3d at 780.

■ With regard to count I of its complaint, plaintiff asserts that the finding by the Village that the RPA was not subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan was erroneous, arbitrary, unreasonable, and false. Presumably, therefore, plaintiff is also asserting that the trial court's affirmation of the municipality's grant of the TIF ordinances is against the manifest weight of the evidence. The TIF Act prohibits the adoption of a redevelopment program unless the municipality can make such a finding. See 65 ILCS 5/11—74.4—3(n) (West 1994). As a result, it is commonly referred to as the "but-for" finding. Plaintiff argues that, as a matter of law, when a project has been under prior development for six years and a developer has been obtaining permits, acquiring property, entering contracts, and investing millions of dollars into the site, a municipality cannot find that the area has not been subject to growth and development or would not reasonably be anticipated to be developed without TIF. Ultimately, the crux of plaintiff's argument is that the developer would have proceeded with the facility even if it had not received TIF.

Plaintiff stresses the facts that show that, at the time that the Village made its "but-for" finding, the incinerator project had already been under development for more than six years. Specifically, the site for the incinerator had been selected in 1988, and as of September 15, 1994, RRRP represented that it had invested $37,418,200 in the proposed area. Plaintiff also points to the many permits obtained, that FW started to clear the land on August 1, 1994, and that construction started immediately after the TIF ordinances were passed. The Village's own TIF ordinance states that Robbins and the developer have "continuously attempted to implement the construction, acquisition, installation, and operation of the Facility" since December 27, 1988.

Plaintiff also argues that a determination that an area is "blighted" will not satisfy the requirements of the "but-for" test. While blight is one of the prerequisites to the adoption of TIF (65 ILCS 5/11—74.4—3 (West 1994)), the RPA must also meet the "but-

for" requirement mentioned in section 11—74.4—3(n)(J)(1) of the Act:

"No development plan shall be adopted unless a municipality complies with all of the following requirements:

(1) the municipality finds that the [RPA] on the whole has not been subject to growth and development through investment by private enterprise and would not reasonably be anticipated to be developed without the adoption of the redevelopment plan." 65 ILCS 5/11—74.4—3(n)(J)(1) (West 1994).

Plaintiff argues that it never contested that the Village was blighted, but that a blighted community may still be subject to a great deal of growth and development through investment by private enterprise. Accordingly, it asks this court to look beyond the Village's portrayal of itself as the victim, and to instead look to what the "but-for" test actually requires.

Finally,[2] plaintiff argues that the TIF revenue was really diverted directly to the Village in the form of rent—something even more damning than the evidence of private investment. Put another way, the TIF revenue, which is a property tax revenue that would normally belong to the Village's neighboring taxing bodies, was intended to be used as a source of funds from which Robbins could be paid rent under the leases. Plaintiff claims that the Village had no explanation for this correlation other than "coincidence."

Plaintiff points to the testimony of its expert, Kevin McCanna, to bolster its claims. At trial, he testified that it was his opinion that TIF was not necessary for the project, that it was not necessary to sell the bonds, and that it was not necessary for the developer. Further, it was his opinion that the project would have gone forward without TIF. According to the projected revenues and cash flows that were supplied to Mr. McCanna, he opined that the additional revenue from TIF was not necessary to the project and that those revenues were sufficiently high to support debt service on the bonds without TIF.

Moreover, it was Mr. McCanna's opinion that the real purpose of TIF was to provide a source of revenue from which the developer could pay the Village its rent under the leases. Using the data from the J.P. Morgan study that the Village commissioned, McCanna added up the rents and found that the amount the Village was to receive during the life of the TIF was $65,952,090, and the projected TIF

---

[2]Plaintiff also makes the argument that the Village's TIF ordinances should not be presumed to be valid. As explained above, however, such a presumption applies only to the review of the ordinances by the trial court, and has nothing to do with this court's review of the trial court's decision. Accordingly, we do not address this argument.

revenues were $66,153,000. This similarity (which is within $50,000) indicated to McCanna that the rents were based on the property taxes, which in turn indicated that the Village was the party that really wanted TIF. He also noted that the jump in property taxes after 2008 and the corresponding jump in the rent to the Village after 2008 indicated that rent was fashioned to reflect the same pattern as the property taxes. It was McCanna's opinion that, at the time that TIF was adopted in 1994, the developer and Robbins were using TIF to divert the property taxes away from the other taxing bodies to the Village.

The Village responds that the developer's activities before August 30, 1994, were only undertaken pursuant to the Village's promise of TIF support. According to the 1988 development agreement, the Village promised to provide TIF support in connection with the development of a waste-to-energy facility at the Cal Sag site. The Village claims that almost all of the development activities and expenditures came about after the promise of TIF support and were carried out in reliance upon it. Accordingly, it claims that plaintiff's argument ignores the 1988 development agreement and the developer's reliance on it. Also, it asserts that plaintiff offered no facts to explain why the 1998 development agreement did not legally obligate the Village to make good on its promise of TIF support, as the law is clear that a municipality has a "duty to take reasonable steps to prevent the contracts it signs contingent on formal approval from collapsing." *Heritage Commons Partner v. Village of Summit*, 730 F. Supp. 821, 825 (N.D. Ill. 1990) (holding that a municipal contract to be financed out of a special fund, such as TIF, is valid).

Such a contention, it continues, has ample evidentiary support. Two of its witnesses, Mr. DiBiassi—of Reading—and Mr. Karpenski—the president of development at that time for FW—repeatedly testified that all of their efforts prior to August 30, 1994, were designed to obtain the financing to build the plant. Moreover, the Village claims, plaintiff offered no contrary evidence or any evidence whatsoever of an irrevocable or predetermined commitment of the developers that the project would be built without financing. As the plaintiff points out in its reply brief, however, the 1988 development agreement contemplated, through reference to the 1988 lease, a privately owned facility. TIF revenue cannot be used to finance the construction of privately owned buildings. See 65 ILCS 5/11—74.4—3(q)(12) (West 1994). Accordingly, when the 1988 agreements were entered, it would have been legally impossible to use TIF revenue for what the developer then intended to be a private facility. Thus, plaintiff concludes, the purported promise of TIF was illegal and void, and the Village cannot

abide by a "promise" of TIF that would be invalidated by its own terms.

Alternatively, the Village asserts, since it is undisputed that the "but-for" finding would have been proper in 1988 when the Village agreed to provide TIF support, the fact that the developer engaged in predevelopment activities in reliance on such promise cannot be used to question the validity of the Village's determination. Otherwise, it argues, municipalities would be unable to offer TIF support before formally approving TIF, which would undermine the use of TIF to develop blighted areas—the true purpose of the TIF Act.

The Village also responds that the trial court was correct in affirming the municipality's conclusion that the Cal Sag site had not been subject to growth and development prior to the adoption of TIF because such efforts would not have amounted to anything had the Village not obtained the financing to build the project. Specifically, it notes the trial court's finding that "[w]ith the possible exception of a foundation for a stack (that was poured in order to maintain a permit), there [were] no improvements to, and therefore no growth at, the Cal Sag site before August 1994." It also notes the testimony of Phil McKenna, a nationally known TIF expert who visited the site immediately prior to August 1994 to prepare a report on whether it qualified for TIF. McKenna testified that the site was vacant except for junk and abandoned buildings.

The Village admits that while the developer spent substantial sums on land acquisition, site clearing, architectural and engineering plans, and local state and federal permitting, the TIF Act focuses not only on "investment" but also on whether that investment has resulted in actual "growth." Accordingly, it points to the trial court's conclusion that the term "growth" in section 11—74.4—3 of the TIF Act "necessarily contemplates new buildings or improvements that increase the value and the tax basis of the property." Here, there is no evidence, and plaintiff does not dispute, that the value of the Cal Sag site had not increased prior to the adoption of TIF. Obviously, defendant concludes, if the Cal Sag site remained blighted prior to the August 1994 enactment of TIF, as plaintiff has stipulated, the site has not been subject to any meaningful growth and development.

The Village further responds that the TIF Act's "but-for" test is whether a site would reasonably be anticipated to be developed without TIF, not whether a particular developer might have proceeded without TIF. The Village argues that "the touchstone for adopting TIF is the physical and economic condition of the property, not the peculiar circumstances of an individual developer." Even the language of section 11—74.4—3(n)(J)(1) of the TIF Act (the "but-for" test), on which

plaintiff relies, focuses on the condition of the site, not the internal decision-making of the developer. As the trial court concluded:

"[T]hat a municipality must focus upon the blighted nature of the site in adopting a redevelopment plan (*i.e.*, in adopting TIF) is further confirmed by the [TIF] Act's definition of such a plan. A redevelopment plan is a program to eliminate those conditions the existence of which qualified the redevelopment project area as a 'blighted area.' TIF Act [section 11—74.4—3(n)(1)]. Thus, the municipality must consider the 'blighted' nature of the property in order to 'reasonably anticipate' whether a redevelopment plan, and therefore TIF, is warranted. Rather than being irrelevant, the *blighted nature of the site is the thread that ties the TIF Act together.*"

Thus, despite plaintiff's entreaty, the Village argues that the primary job of the municipality—and therefore the trial court—was to consider the condition of the land, not the condition of the developer.

The Village next responds that since TIF was necessary to the developer and to the financing of the project, the "but-for" test, even as suggested by the plaintiff, is satisfied. For this, it points to the trial court's conclusion that the developer needed TIF to meet its minimal investment return threshold and to eliminate the risk of a crippling tax assessment:

"TIF was necessary to the developer for at least two reasons. First, the lowest projections of future incremental property taxes for the improved property start at $1.5 million and increase to over $6 million a year, totaling $66 million over the 20-year life of a TIF. (PX 69.) Based upon this estimate, the TIF would have increased RRRP/FW's projected net profits by approximately 20%, raising its after-tax rate of return from about 12% to 15%. Since 12% was significantly lower than any previous Foster-Wheeler project, and 15% was as low as management was willing to go, TIF made the difference on the project proceeding. This was particularly true in light of the evidence that RRRP/FW believed there was a significant risk that these projections would not be met, as indeed it had turned out. In this regard, the project is failing even with the TIF, due in part to [plaintiff's successful effort to cause the legislature to repeal] the Retail Rate Law, which lowered actual electric revenues 50% below projections, thereby resulting in over $200 million in losses and a project that is destined for bankruptcy.

Second, TIF was necessary to the developer because no one knew what the taxes would be. There was no way to obtain a preassessment from the assessor; there were no incinerators to use as comparables, which limited the validity of any valuation; and there was no way to know if the huge boilers, which incinerate the trash,

would be considered personal property, and since there was at least one prior instance in another state where the boilers were assessed as real property, TIF eliminated what easily could have been a doubling or tripling of estimated taxes. For example, RRRP/FW ordered an appraisal in 1994, which determined that the fair market value of the facility approximated the cost of construction, *i.e.*, $400 million. Any assessment based upon such a fair market value would have eliminated any possibility of profits. [Accordingly, the TIF was necessary] to channel any large tax assessment back to the project to pay eligible costs."

The Village notes that the evidence adduced by plaintiff at trial demonstrates factual support for this finding as well. Mr. Karpenski, as a witness called by the plaintiff, testified that TIF raised the expected after tax rate return from 12% to 15%. Not only was this a 25% increase due to TIF, but Karpenski's testimony also revealed that FW/RRRP would not have accepted a lower rate of return on its $100 million equity investment because of the risks associated with the project.

Moreover, the Village asserts that for the project to occur, third-party financing had to be obtained. To obtain such financing, the Village issued industrial development revenue bonds (IRBs) to be repaid from project revenues and partially secured by incremental property taxes, *i.e.*, the TIF revenues. Obviously, the only way for the underwriters to sell the bonds was to be able to convince buyers that the debt would be repaid, namely, that net revenues from the facility would exceed the principal and interest due on the bonds. As stated above, however, no one knew what the tax assessment was going to be. This led to Smith-Barney's specific advice to the Village that it should adopt TIF. It stated:

"If the Series A bonds were not secured by the pledged TIF revenues, the risk of failure to obtain financing would be materially greater. Availability of the Pledged TIF revenues raises the coverage of the project revenues over debt service, and reduces the disposal fee at which the 80% of uncontracted disposal capacity can be sold. *** The project is economically unfeasible without a successful sale of the Series A tax exempt bonds."

The Village also claims that McCanna's testimony that TIF "was not necessary for the developer" was simply a bald assertion and was not based on any calculation or analysis that disputes FW/RRRP's expected rate of return.

Lastly, the Village states that the rent paid to it by the developer was proven to be fair and reasonable and in no way undermines the TIF adoption. The Village argues that plaintiff cannot argue that the amount of the lease is unreasonable or unnecessary. As the trial court

found, the only evidence concerning the propriety of these payments was an independent study performed by J.P. Morgan, which established:

> "[T]hat the payments to the Village under the Facility Site Lease and Host Benefits agreement are 'fair and reasonable.' The study was based on a review and analysis of payments by developers of host benefits to governmental units in 26 similar situations, and has nothing to do with the adoption of TIF."

The Village points to section 11—74.4—4(g) of the TIF Act, which allows a municipality "[w]ithin a redevelopment project area [to], fix, charge and collect fees, rents and charges for the use of any building or property owned or leased by it or any part thereof, or facility therein." 65 ILCS 5/11—74.4—4(g) (West 1994). Given the evidence regarding the reasonableness of the rent payments, the Village concludes the trial court's finding conforms to the manifest weight of the evidence. As the court held, "since plaintiff presented no evidence that these lease payments to the Village were not necessary, fair, and reasonable, and since such lease payments are expressly allowed under [section 11—74.4—4(g)] of the TIF Act, plaintiff's argument fails."

We agree with the trial court that, under plaintiff's theory, if a city promises to provide TIF support and a developer relied on such a promise by proceeding with predevelopment activities, the city could never make good on its promise. In reviewing the TIF Act, we also do not find it apparent that the legislature intended to create such a "Catch-22." Moreover, with regard to the contention that the 1988 agreement was invalidated by its own internal reference to a privately owned building, the final 1994 agreements eventually provided for a facility that was publicly owned. Accordingly, because the plaintiff has provided only minimal affirmative evidence that the 1988 agreement/promise of TIF was invalid or that the statute specifically forbids *any* investment in a potential RPA, we affirm the trial court's finding that the Village properly considered the developer's reliance on the promise in making its "but-for" determination as not being against the manifest weight of the evidence.

Secondly, with respect to plaintiff's contention that the trial court implemented defendant's improper interpretation of the "but-for" test, we believe that it would be impossible to determine whether a possible RPA has the potential to be developed by private investors without looking at the condition of the land itself. Plaintiff's suggestion that a determination that an area is "blighted," by itself, will not satisfy the requirements of the "but-for" test is well taken. However, section 11—74.4—3(n) of the TIF Act specifically states that a municipality must determine whether a redevelopment plan would

reasonably be anticipated to "reduce or eliminate those conditions the existence of which qualified the [site] as a blighted area." This includes both an assessment of the possible RPA itself as well as other economic factors surrounding and impacting the site.

■ In the present case, the undisputed facts show that the Village of Robbins was, and currently is, an economically depressed community that was without any growth and development for many years. Between 1980 and 1990, the Village's population decreased by over 15%, and its level of home ownership by 6%. The Village's *per capita* income of $8,117 in the 1990 census put it in the five poorest communities in the Chicago metropolitan area. Additionally, the Village's inadequate infrastructure, such as an antiquated water system and unreliable police and fire protection, resulted in a poor insurance rating that had been unattractive to businesses. Indeed, plaintiff was unable to produce evidence of any potential investors other than FW/RRRP that intended to invest in the growth and development of the Cal Sag site.

However, as defendant argues, even if the evidence of the blighted condition of the site and the Village is ignored, the evidence still shows that FW/RRRP—the only potential developer—still needed TIF to finance the incinerator project. For without TIF, or at least the promise of TIF, no investors whatsoever were interested in developing the Cal Sag site. As previously stated, because the lowest projections of future incremental property taxes for the improved property totaled $60 million over the 20-year period of the TIF, FW/RRRP's projected net profits would have increase by approximately 20%, increasing its after-tax rate of return from 12% to 15%. Because testimonial evidence at trial suggested that 12% was significantly lower than any previous FW project, and 15% was as low as management was willing to go, TIF was the deciding factor in the proceeding. Mindful of the evidence in the Smith-Barney appraisal suggesting that these projections might still not be met,[3] even with TIF, we agree with the trial court that defendant has satisfied the "but-for" test.

In addition to the evidence concerning projected returns, however, defendant also points to undisputed evidence that neither FW nor RRRP intended to self-finance the $400 million required for the development and the construction of the facility and, therefore, that third-party financing had to be obtained. To get that financing, the

---

[3]As the trial court points out, this proved to be true. Due in part to the repeal of the retail rate law (220 ILCS 5/8—403.1 (West 1992)), which lowered actual electric revenues 50% below projections, the project suffered over $200 million in losses and may be destined for bankruptcy.

buyers had to be convinced that the bonds would be repaid, *i.e.,* that revenues from the project would exceed the principal and interest on the bonds. Without TIF, the unknown property tax risk associated with the facility would have, in all likelihood, threatened the sale of the bonds since there would have been a large and indeterminate expense item.

■ This leads back to the plaintiff's last contention on this issue, that because the Village was to receive certain benefit payments, like rent, from FW/RRRP over the life of the project, these payments set off the developer's need for TIF. However, we find that Mr. McCanna's testimony for the plaintiff regarding the correlation between the rent and the tax increment is not supported by any evidence. The undisputed testimony at trial revealed that no one was certain what the property taxes would be. Consequently, there were no grounds to conclude that the rent was somehow tied to the tax assessments. Moreover, as the trial court points out, the actual rent payments being received by the Village are considerably less than the $66 million posed by the plaintiff since roughly two-thirds of those payments were contingent upon the profitability of the plant.

In addition, the J.P. Morgan study established that the payments to the Village under the "Facility Site Lease and Host Benefits Agreement" were "fair and reasonable." Again, as the trial court noted, the study was based on a review of payments by developers of host benefits to governmental units in 26 separate instances and has nothing to do with the adoption of TIF. And because such lease payments are expressly allowed under section 11—74.4—4(g) of the Act, plaintiff's argument fails.

Without more evidence by the plaintiff, therefore, we hold that the trial court's decision that "the Village properly considered that both Reading and RRRP/FW had relied upon the Village's written promise of TIF support in pursuing the project and undertaking predevelopment activities" was not against the manifest weight of the evidence, as none of plaintiff's contentions is even borne out by the evidence in the record.

■ In count VII, plaintiff contended at trial that under section 11—74.4—7.1 of the TIF Act (65 ILCS 5/11—74.4—7.1 (West 1994)) it is entitled to a portion of 25% of the cost of the incinerator because it is a municipal public building that provides governmental services. That section states:

> "After the effective date of this amendatory Act of 1994 a municipality with a population of less than 1,000,000, prior to construction of a new municipal public building that provides governmental services to be financed with tax increment revenues

as authorized in paragraph (4) of subsection (q) of Section 11—74.4—3, shall agree with the affected taxing districts to pay them, to the extent tax increment finance revenues are available, over the life of the redevelopment project area, an amount equal to 25% of the cost of the building, such payments to be paid to the taxing districts in the same proportion as the most recent distribution by the county collector to the affected taxing districts of real property taxes from taxable real property in the redevelopment project area.

This Section does not apply to a municipality that, before March 14, 1994 (the effective date of Public Act 88—537), acquired or leased the land (i) upon which a new municipal public building is to be constructed and (ii) for which an existing redevelopment plan or a redevelopment agreement includes provisions for the construction of a new municipal public building." 65 ILCS 5/11—74.4—7.1 (West 1994).

During the hearings on the motions for summary judgment, the court found that facility was a municipal and public building. As such, the issue at trial was framed as whether the services were governmental.[4]

For this contention, plaintiff cites to extensive case law intimating that the collection and disposal of garbage is a governmental service that has been traditionally performed by governmental agencies. "The gathering of garbage is not a trade, business, or occupation, but it is a public duty, to be performed by a city in a manner that will best promote the health of the inhabitants." 7 McQuillin on Municipal Corporations § 24.25 (3d rev. ed. 1997). See also *Walker v. Jameson*, 140 Ind. 591, 37 N.E. 402 (1894); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 128 L. Ed. 2d 399, 114 S. Ct. 1677 (1994) (Justice Souter specifically recognizing in dissent that the collection and disposal of garbage is traditionally a governmental function and has been throughout the history of this country); *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272 (2d Cir. 1995) ("For ninety years, it has been settled law that garbage collection and disposal is a core function of local government in the United States").

Similarly, in *P&A. Carting Co. v. City of New York*, 7 Misc. 2d 815, 158 N.Y.S.2d 296 (1956), the court considered a New York City ordinance that placed certain requirements on licensed private garbage haulers. In upholding the relevant section of the ordinance, the court stated:

> "The collection and disposal of garbage and waste products is quite obviously a function which is vitally essential for the mainte-

---

[4]At trial, neither side asked that the findings in the summary judgment hearings be revisited. Therefore, the trial court limited itself to the issue of whether the services are governmental.

nance of public health and safety. A municipality may perform the function of removal directly through its own department; or it may have it performed under a public contract; or it may require a license to be obtained by persons or firms authorized and qualified to perform that function." *P.&A. Carting*, 7 Misc. 2d at ___, 158 N.Y.S.2d at 298.

The court went on to state that a municipality always retains the "duty to exercise such supervision and control as will prevent danger to public health and injury to the public interest." *P.&A. Carting*, 7 Misc. 2d at ___, 158 N.Y.S.2d at 298. Moreover, "[e]ven where licensees are engaged in this activity, 'it is primarily governmental in nature and object, although private enterprise is utilized in performing it.' [Citation.]" *P.&A. Carting*, 7 Misc. 2d at ___, 158 N.Y.S.2d at 301.

Plaintiff notes that Illinois cases have also recognized that "[c]ollection of refuse is ordinarily a governmental function." *Skyrise Apartments, Inc. v. City of Rockford*, 83 Ill. App. 3d 447, 449 (1980). In that case, owners of a residential apartment building sued the city for damages resulting from the city's failure to collect garbage from the apartment buildings. In rejecting the plaintiffs' claim, the court ruled that the ordinance did not create any contractual rights in the plaintiff because the function of picking up garbage was a proprietary one. *Skyrise*, 83 Ill. App. 3d at 449-50.

Defendant, on the other hand, argues that the evidence established that the waste-to-energy facility is leased by the Village to FW/RRRP, a private, for-profit company and that it operates the facility without any involvement or supervision from the Village. It notes that the incinerator is not open to the public and that it serves the public like any other private company meeting a general need. In addition, it argues, the fact that the facility incinerates trash generated by the public does not make the business an auxiliary arm of the government any more than the private garbage haulers that collect trash.

For this, defendant quotes *Gravander v. City of Chicago*, 399 Ill. 381 (1948), where the supreme court held that "the collection and removal of garbage is a corporate and not a public function." *Gravander*, 399 Ill. at 387. Further, the court held that when a municipality collects and removes the garbage of its citizens, with its own trucks and employees, it is not performing a "government function." In so ruling, defendant claims, the supreme court rejected the same argument put forward by the plaintiff in the present case:

"[T]he fact that [garbage removal] might incidentally benefit the public health does not make the removal of garbage a public function.

\*\*\* [T]he mere fact that the public at large might benefit

indirectly therefrom is not sufficient to make the function a governmental one, for almost all affairs of purely local concern produce some indirect results on the general safety, health, and welfare." *Gravander*, 399 Ill. at 387.

Ultimately, the court concluded that because garbage collection is not a governmental function, municipalities that provide garbage collection/disposal services do not enjoy tort immunity with respect to that nongovernmental activity as they might with such activities as police and fire protection under traditional rules of governmental immunity.

In comparing these two seemingly divergent opinions, the trial court concluded that whether the services are proprietary or governmental depends on the circumstances surrounding the claim. It also noted the historical origin of this inquiry, as explained in *Hart v. Bridgeport*, 11 F. Cas. 681 (C.C.D. Conn. 1876) (No. 6149):

"Public duties are, in general, those which are exercised by the state as part of its sovereignty, for the benefit of the whole public, and the discharge of which is delegated or imposed by the state upon the municipal corporation. They are not exercised either by the state or the corporation for its own *** benefit, but for the benefit and protection of the entire population. *** Private or corporate powers are those which the city is authorized to execute for its own emolument, and from which it derives special advantage, or for the increased *** convenient regulation of particular classes of the business of its inhabitants, but are not exercised in the discharge of those general and recognized duties which are undertaken by the government for the universal benefit."

Based on that type of analysis, the trial court concluded that the *Gravander* court was engaged in an inquiry of whether waste disposal was a governmental or proprietary function *in the context of* a plaintiff's injuries caused by a garbage truck driver's negligence. Under the facts of the *Gravander* case, the court reasoned that the conduct at issue was part of the proprietary function of the government. *Gravander*, 399 Ill. at 387. Importantly, it explained that the decision to adopt a plan for waste disposal is a governmental function, but once the municipality begins to carry out its plan, the conduct becomes ministerial. Comparatively, in *Skyrise*, the court found that waste disposal was governmental. As the trial court noted in the case at bar, however, the *Skyrise* court was deciding whether the plaintiff had a right to recover damages for garbage collection expenses when it claimed that the municipality was obliged to perform those services by law. *Skyrise*, 83 Ill. App. 3d at 449.

Given the contextual nature of this inquiry, therefore, the trial court concluded that if the plaintiff was asking for damages for

negligent performance, the services would be proprietary. Moreover, it continued, if the plaintiff was asking it to determine whether the decision to provide waste disposal services was governmental or proprietary, its answer would be governmental. This was because it appeared to the court that even if the Village was not performing the services described, it still made the decision to provide for those services in the context of the 1988 agreement, the 1994 plan, and all the other related documents that subsidize the project by providing a public building for FW/RRRP to lease and to operate as a waste-to-energy facility.

■ However, the court held that this was not the end of the inquiry. In reviewing section 11—74.4—7.1 of the TIF Act, the court noted that there is no mention of a governmental-proprietary analysis as a prerequisite to determining whether that section applies. This is evident, the court held, in the testimony of the Village's expert witness, Patricia Curtner, who stated that there is no legislative history or case law to assist the court in determining what those three words (public, municipal, governmental) mean when read together. For example, the statute does not address whether the governmental services are to be performed by the municipality or by a private business. As noted by the defendant, the Village has nothing to do with directing or supervising the operations of the facility, and FW/RRRP's sole purpose was to operate the business to make a profit. Moreover, the trial court found Ms. Curtner's testimony on this issue to be convincing. At trial, she stated that it was her opinion that the purpose of section 11—74.4—7.1 was to prohibit using the TIF funds to construct a public purpose building such as a town hall, where presumably there is direct payment for services and the building serves only the municipality. Here, the facility serves a number of municipalities, and no similar facilities existed prior to 1994—thus showing that the service at issue (waste-to-energy vs. simple waste disposal) was not a governmental service prior to the facility being built. Thus, the court concluded that section 11—74.4—7.1 is not applicable to the facility on this basis.

Plaintiff points out in its reply brief that "governmental services" are not simply services that are provided for a "public purpose." It claims that "[w]hether or not something is done for a 'public purpose' has to do with the intent of the party engaging in the activity. Whether or not something is governmental has to do with the nature of the service that is performed, regardless of the intent of the performer." As such, plaintiff claims that regardless of whether private individuals intended to make a profit, their activity was still a governmental one.

Moreover, plaintiff claims, the evidence at trial showed that the

developer itself believed it was engaging in governmental services for two reasons. First, the developer entered into 12 municipal agreements with various municipalities pursuant to authority granted them under section 11—19—1 of the Illinois Municipal Code (65 ILCS 5/11—19—1 (West 1994)). Under these provisions, the municipalities exercised their governmental authority and committed all their waste to the facility and agreed to appropriate funds and levy taxes to satisfy their obligations under these contracts. They agreed to require all waste haulers to bring all of their refuse to the facility. Consequently, plaintiff argues, if this were not a governmental service, and these municipalities were not exercising their governmental power, then this would be an illegal restraint on trade. Second, a number of parcels that comprise the subject property were taken by the Village in condemnation. In its condemnation petition, the Village specifically alleged that "the work and improvement aforesaid (the facility) is a public work, is for public service, and constitutes a public service."

We think that the trial court's determination that FW/RRRP's decision to provide waste disposal services is governmental is correct in that the Village agreed to lease and subsidize the land for the public purpose of waste disposal. This much we can glean from the *Gravander* decision. However, it also appears that the trial court was correct in determining that once the plan for the facility was set, its purpose became a ministerial one in that the developers were simply engaging in a profit-seeking enterprise. This finding is evident from a review of the testimony in the record. While it is true that the Village entered into municipal agreements with the surrounding communities and condemned certain parcels of land "for public use," such actions were taken in the context of deciding to set up a waste disposal service. However, even if we were to find that *Gravander* holds for the proposition that the disposal of waste is a governmental service no matter what the intent of the private entity in charge, the timing considerations of section 11—74.4—7.1 prevents us from reversing on this basis.

Defendant's alternative argument on this issue is that even if section 11—74.4—7.1 otherwise applied, it contains a express exclusion for "new municipal public buildings" which were part of an existing redevelopment agreement or redevelopment plan, if the land for the building was acquired prior to March 14, 1994. Here, the 1988 development agreement between the Village and the developer (at the time, Reading) provided for the construction of the municipally owned waste-to-energy facility at issue. It claims that since plaintiff stipulated that the land for the facility was acquired before March 14, 1994, section 11—74.4—7.1 does not apply.

Plaintiff responds that the 1988 lease, between the Village as landlord and the developer as tenant, allegedly states that the developer will own the building. Therefore, according to plaintiff, the development agreement does not provide for a "new municipal building." In addition, it notes that, according to section 11—74.4—4.4 of the TIF Act, a redevelopment agreement must be adopted by ordinance. Here, the 1988 development agreement was not adopted by ordinance and therefore cannot be considered a "redevelopment agreement." Lastly, the plaintiff claims that the trial court erred in adding a new date to the statutory language creating section 11—74.4—7.1. In its written opinion, the court held that an exemption from section 11—74.4—7.1 would be triggered if a municipality had a redevelopment plan or agreement by January 24, 1995, not by March 14, 1994, as the statute states.

With regard to plaintiff's first response, the provision to which it points in the 1988 lease, entitled "ownership of improvements," simply states that "any buildings or other improvements constructed on the Demised Premises by Tenant shall be owned by Tenant." Here, the building was constructed with bond proceeds which came from the Village's sale of bonds. Therefore, as the 1994 lease confirms, the Village, not the tenant, in being responsible for funding construction, owned the building.

Second, as the trial court held, the statutory requirement of section 11—74.4—7.1(ii) refers to an existing redevelopment plan *or* redevelopment agreement. While the *lease* is covered by section 11—74.4—4(c) of the TIF Act and must be passed by ordinance to be valid, such a requirement does not apply to a redevelopment plan. Section 11—74.4—5 of the TIF Act requires that prior to *approving* a redevelopment plan, the municipality shall adopt an ordinance fixing a time and a place for a public hearing. However, as the trial court held, such language contemplates the existence of a redevelopment plan prior to its passage by ordinance. Thus, the redevelopment plan need not be passed by ordinance to be exempt from section 11—74.4—7.1's requirements.

Third, the exemption in section 11—74.4—7.1 was amended on January 24, 1995, to cover "a new municipal public building" in an "existing redevelopment plan." 65 ILCS 5/11—74.4—7.1 (West 1994). The trial court noted that because the "acquisition of property" requirement is stated in the past tense (and, therefore, that the March 14, 1994, deadline applies to it), and the "new municipal building" and "redevelopment plan or agreement" requirements are in the future tense, the January 24, 1995, deadline should apply to it. At trial, plaintiff did not deny that the amendment was designed to assist

municipalities that had engaged in organizing and obtaining the series of agreements required for these types of projects, but had not yet developed a redevelopment plan or agreement. Further, it did not deny that such a grace period would help to free those types of projects that were "caught in the switches" at the time of section 11—74.4—7.1's initial enactment.

Taking plaintiff's arguments into consideration, we find that the timing of the redevelopment plan allows the Village to escape section 11—74.4—7.1's requirements. For even if we were to assume that the 1994 lease was entered on September 15, 1994, the date on which the developers reached a redevelopment agreement, that date still beats the amended January 24, 1995, deadline. Given the extended nature of this project and the fact that it did not change substantially from 1988 until 1994, we affirm the trial court's decision to refuse to apply section 11—74.4—7.1 to the project.

For the reasons stated, we affirm the trial court's dismissal of all of plaintiff's claims.

Affirmed.

CAMPBELL, P.J., and REID, J., concur.